**GEORGIA VEGETABLE CO., INC.,**
**Plaintiff-Appellee,**

v.

**Joseph A. RELAN, d/b/a Relan Produce Farms, Defendant-Appellant.**

**No. 83–8284.**

United States Court of Appeals, Eleventh Circuit.

May 7, 1984.

---

Joseph A. Relan, pro se.

Lynn Kelley, Tifton, Ga., for plaintiff-appellee.

Before KRAVITCH and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

We have here on appeal a judgment in a non-jury trial setting aside a reparation order by the Secretary of Agriculture to the shipper of perishable vegetables under the provision of the Perishable Agricultural Commodities Act, 7 U.S.C. § 499f. This statute, enacted in 1930, provides for the licensing of persons engaged in the business of buying or selling perishable commodities in interstate commerce. It also outlines certain courses of conduct as being unlawful, and then authorizes the issuance of regulations the better to carry the legislation into effect.

Among the provisions in the statute is § 499e providing that liabilities for violations of the Act may be enforced by complaint to the Secretary followed by *de novo* appeal to the appropriate district court.

The complaint related to three shipments by Joseph A. Relan doing business as Relan Produce Farms of Amite, Louisiana, to Georgia Vegetable Company of Tifton, Georgia. For convenience we will designate these shipments as Nos. 1, 2, and 3. The Secretary made findings of fact concerning these three shipments, a part of which included the following:

Shipment 1: On or about June 26, 1980, the parties entered into an agreement whereby respondent (Georgia Vegetable) was to sell for complainant's account one lot of green peppers. On that date complainant shipped from a Louisiana loading point one truckload of green peppers consisting of 1,102 cartons of large U.S. No. 1 peppers and 200 cartons of medium U.S. No. 2 peppers. The truck contain-

ing these peppers arrived at respondent's place of business at an unknown time and date.

The peppers on this truck were received and accepted by respondent, and sold by respondent on or about June 28, 1981, to buyers in Georgia, North Carolina, Kansas City and Houston. Respondent remitted a total of $7526.70 to complainant for 802 cartons of large and 200 cartons of medium peppers sold, leaving 300 cartons of large peppers unaccounted for.

Shipment 2: On June 30, 1980 complainant and respondent entered into an oral contract for the sale by complainant and purchase by respondent of another truckload of peppers at a price of $9.50 per carton delivered to Tifton, Georgia. On that date, complainant loaded and shipped from a loading point in the State of Louisiana one truckload of peppers consisting of 1,064 cartons of large U.S. No. 1's conforming to the contract.

This June 30, 1980 shipment reached the respondent's place of business in Tifton, Georgia at an unknown time and date and was received and accepted by respondent.

Respondent has remitted $5,006 to complainant for this lot of peppers, leaving a balance due of $5,102.

Shipment No. 3: On June 26, 1980 the parties entered into an oral contract for the sale of one truckload of peppers, to be delivered to respondent's customer Castellini in Cincinnati, Ohio. Under this contract the price is $9.25 per carton for large U.S. No. 1 peppers, and $5.50 per carton for medium U.S. No. 2 peppers, delivered. On that same date, complainant loaded out from its Louisiana loading point 903 cartons of large U.S. No. 1 peppers and 290 cartons of medium U.S. No. 2 peppers into a truck operated by Walker Truck Lines, Mississippi License 2471.

That truck arrived in Cincinnati at an unknown time and date. It was received and accepted by respondent's customer in Cincinnati, but at that time the customer expressed some doubt about the product by telephone to respondent in Georgia and also to complainant. Complainant asked for a federal inspection, but this was not obtained.

At an unknown time and date, respondent remitted to complainant the amount of $6,132.25, leaving a balance of $3,815.50.

For reasons, differing with respect to each of the three shipments, as discussed below, the Secretary entered a reparations order in favor of Relan for the sum of $14,461.68 with interest.

In its suit to set aside the reparations order, Georgia Vegetable challenged the facts as found by the Secretary and, without making any mention of the regulations issued under § 499e, asserted, in general terms, that the transactions had all been handled in accordance with a custom which had grown up between the parties over a period of some 15 years of dealings. It also alleged that the stated custom between these parties had in fact become a custom of the trade, which should control the relations between the parties.

On his part, Relan seeks to have us hold that a custom of dealing between the parties could not constitute a waiver or estoppel against his relying upon the regulations and that a custom of the trade could not prevent him from relying upon the regulations. Because of the specific findings by the Secretary, Relan's express request in his defensive pleadings in the district court action that the court affirm in full the action of the Secretary, and the failure of Relan to file a cross-appeal complaining of the failure of the Secretary to base his findings on the failure of Georgia Vegetable to comply with other regulations, not specified by the Secretary, we conclude that we do not reach these issues.

In his responsive pleading, appellant Relan dealt with each shipment separately and after asserting factual matters with respect to each concluded with the following statement: "By way of further answer the respondent adopts and incorporates the findings and conclusions of the Secretary

of Agriculture and prays that they be adopted and affirmed by this court." In addition, under the heading "Argument" in the defensive pleading, he stated again: "The respondent adopts and incorporates the findings and conclusions of the Secretary of Agriculture (as they appear in Exhibits B and C) and prays that the findings of said judicial officer be adopted and affirmed by this court." Thus, four times in his defensive pleading, appellant made it plain that the decision of the Secretary, and the basis for the decision was adopted by him as his stated position in the district court hearing.

Now, on appeal, Relan cites a number of regulations as codified generally under 7 C.F.R. 46.2 *et seq.*[1] The problem facing appellant here is that the Secretary based none of his awards in his reparation order on either of these regulations. Thus, the district court was not put on notice of the fact that they were involved in the case to be tried by it. A careful reading of the entire transcript of the trial makes it clear that at no time was the trial court expressly put on notice of the contentions of the appellant that the failure of Georgia Vegetable Company to comply with either of these regulations entitled Relan to have the Secretary's order affirmed.

The standard of review before the district court was established by the statute: "Such suit in the district court shall be a trial *de novo* and shall proceed in all respects like other civil suits for damages, except that the findings of fact and order or orders of the Secretary shall be prima facie evidence of the facts therein stated." 7 U.S.C. § 499g(c).

Because the Secretary's order cited explicit grounds for his determination that Relan was entitled to recovery on each of the three shipments and since we conclude that it is only these grounds that may be considered on this appeal, *Wolf v. Frank,* 477 F.2d 467 (5th Cir.1973), *cert. denied,* 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218, we quote the language of the Secretary's order dealing with each specific shipment. Under the heading "Conclusions" the order provided as follows. As to Shipment No. 1:

... It is not clear from the record that respondent ever rendered a timely accounting for this transaction. What is clear is that it shipped more than half of the peppers out of Georgia; *i.e.* to Houston, Kansas City, and North Carolina points, in violation of a PACA regulation 7 C.F.R. 46.29(a), which requires the consignor's permission to sell consigned produce outside the consignee's market area. Clearly no permission was given here since complainant is insisting that he should have received the prices prevailing in the nearest Georgia market.

We agree that the respondent's handling of this transaction is below the standard of care and diligence contemplated by the above numbered regulation. Respondent should have made a diligent effort to obtain the best prices possible....

As to the second shipment:

For the truck shipped on June 30, 1980 which respondent received in Tifton, Georgia, respondent resisted paying the full invoice amount because of the poor arrival condition. Respondent alleges that after discussion with complainant

1. Two of these regulations are:

    7 C.F.R. 46.22 *Accounting for Dumped Produce* ... If five percent or more of a shipment is dumped an official certificate, or other adequate evidence, shall be obtained to prove the product was actually without commercial value, unless there is a specific agreement to the contrary between the parties.

    7 C.F.R. 42.29 *Duties of Consignee* Complete and detailed records shall be prepared and maintained by all commission merchants ... covering produce received, sales quantities lost, dates and cost of repacking, or reconditioning, unloading, handling ... and any other expenses which are deducted on the accounting, in accordance with the provisions of § 46.18 through 46.23. When rendering account of sales of produce for on behalf of another, an accurate and itemized report of sales and expenses charged against the shipment shall be made. It is a violation of § 2 of this Act to fail to render true and correct accountings in connection with consignments or produce handled on joint accounts.... The commission merchant may be held liable for any financial loss....

some of the product was dumped and some of it sold and that he had already paid "more than the pepper was worth." Complainant's opening statement is a rambling and in part, incoherent response to respondent's answer regarding this transaction, but complainant seems to be saying that respondent should have obtained a federal inspection on the lot to support any deductions from the purchase price. Respondent did attach a copy of a July 2, 1980 report of inspection of some Louisiana peppers made in its cooler in Tifton, Georgia. The report does describe a somewhat decayed product. However, since the cartons did not have complainant's name or brand on them there is no proof that the peppers inspected were from the lot shipped by complainant on June 30. We must conclude that respondent, having failed to show a breach of contract—a poor arrival condition of the product—is liable for the full purchase price. *Jimmy Grizzard Sales v. Lloyd Myers,* 40 A.B. 830 (1981). Its failure to pay that sum to complainant is a violation of § 2 of the Act for which reparation should be awarded. (footnote omitted)

As to shipment 3:

Respondent is in much of the same situation for the peppers which complainant shipped on June 26, 1980 to respondent's customer in Cincinnati. Respondent states that these were first refused by its customer as bad on arrival, but later the customer paid $6,132.25 for this lot, which amount respondent then remitted to complainant.

Apparently respondent is trying to escape responsibility for this transaction by converting it into a consignment, but has not proved that complainant agreed to this. Complainant does not exactly deny this but states that it had requested a federal inspection and never received it. We conclude that complainant's agreement for consignment handling, if there was one, was conditioned on respondent's

furnishing proof of bad arrival. Since respondent never complied with this condition, the transaction remained an outright sale under the terms of which respondent is liable for the full purchase price. Its failure to pay the same is a violation of section 2 of the Act for which reparation should be awarded.

In a trial *de novo* evidence in addition to that introduced before the Secretary may, of course, be offered and considered in the *de novo* trial.

Once again, we go back to the three separate shipments.

Shipment No. 1: The Secretary's order as to this shipment was based upon a violation of PAC regulation 7 C.F.R. 46.29(a), "which requires the consignor's permission to sell consigned produce outside the consignee's market area." [2] This, then, presented to the trial court for determination the question whether Relan granted his permission for the sales that were made outside the Atlanta market.

The trial court's findings of fact as to this shipment include the following:

B. Upon receiving that shipment, several employees of Georgia Vegetable noted some decay in the peppers.

C. Robert Grice, the president of Georgia Vegetable then called Relan and rejected the shipment as being non-conforming.

D. Relan then requested Georgia Vegetable *to salvage as much of the pepper as they could to sell it at the best price available.* Georgia Vegetable then asked if Relan wanted a federal inspection but Relan's response was not to do so as that would only cost them additional money. (emphasis added.)

The only question here is whether the evidence supported the trial court's finding that Relan requested Georgia Vegetable "to salvage as much of the pepper as they could to sell it the best price available," (sic) because we consider such language

2. This regulation provides as follows in pertinent part: 7 C.F.R. 46.29 *Sales Outside the Designated Market* A commission merchant is not authorized to sell consigned produce outside the market area where he is located without obtaining the permission of the consignor.

would be an agreement by Relan to sell outside the Atlanta market.

■ The record amply supports this finding. In the cross-examination of Relan, the following occurred:

Q. I said isn't it true on this load 1, all Georgia Vegetable was supposed to do was to get the best price available that he could for the pepper, and then account to you for what that price that he received was?

A. Account to me for what it was?

Q. Yes, sir, is that a true statement?

A. Yes, that's true. That's the way it's supposed to be done.

Testimony by Robert Grice of Georgia Vegetable was as follows:

... A. I said "Charlie, I know that you sent this load of pepper on consignment but I just wanted to report to you that there might be a little problem in it, but we're going ahead and try to ship it on out, because we have got orders and trucks here waiting on it." And I said "That's what we're going to do with it" and he said "That's perfectly okay."

There being no indication in the testimony of either of the parties that any limitations were to be imposed upon the area in which the peppers were to be sold, we conclude that the trial court's finding of fact is adequately supported in the record.

■ Shipment No. 2: The Secretary's order as to this shipment was based upon his finding that "there is no proof that the peppers inspected were from the lot shipped by complainant on June 30." The absence of such proof was rectified at the trial in the district court. There was ample evidence that the inspection report with respect to the 300 cartons showed that they were a part of Shipment No. 2. Although no specific finding was made by the trial court to this effect, it must be implied from the trial court's judgment.

■ Shipment No. 3: The Secretary's finding as to this shipment was based on his assumption that the original sales contract between Relan and Georgia Vegetable was the contract claimed upon. In fact, however, the trial court determined that when Georgia Vegetable received a report from Castellini, the consignee of the shipment, that it contained some bad peppers Georgia Vegetable asked Relan to negotiate directly with Castellini with respect to the shipment, and Relan agreed to do so. In effect, the trial court's decision left open the issue as to whether Castellini should have obtained a government inspection before rejecting the shipment, because no claim by Relan against Castellini was before the court. We conclude that there is sufficient evidence in the record to support the court's finding that a novation was made between Relan and Castellini.[3]

In addition, however, Relan complains that he was importuned by Georgia Vegetable to deal with Castellini only by the making of a false (albeit in good faith) statement to Relan. The false statement relied upon by Relan is the fact that Castellini had had a federal inspection before

---

**3.** Grice testified that he received a call from the Castellini Company and then testified as follows: "And he said, 'Robert this pepper is real bad' and he said 'this is what the inspection reads' and it amounted up to approximately 47 percent bad pepper, and he said, 'there ain't no way that the Castellini Company can accept this load of pepper like this.' So, in turn, I called Mr. Charlie down there, and I told him that is what Mr. Carl Klein had told me, and I said, 'Charlie, I'm going to have to give the pepper back to you, because I don't know where else to go with it and this won't suit my customer.' and Charlie said, 'Well, I don't know what else I would do with it,' he said, 'Do you reckon the Castellini Company would handle this load of pepper for my account?' I said, 'Well, Charlie, you can call Mr. Carl Klein and see', and I said, 'Wait five or ten minutes before you call him and I'll call him and tell him that you are good people out there and maybe he'll keep the load of pepper and help you with it.' So, in turn, I called Carl back and told him that Mr. Relan would like for him to handle that load of pepper for them if he would, and I said, 'Mr. Relan is going to call you just in a few minutes.' So, Charlie did call him and then in, I guess, I don't know, it might have been 15 or 20 minutes, Charlie did call me back, and he said, 'Robert, I've got Mr. Carl to handle that load of pepper for us,' and he said, 'I appreciate you helping me with it,' and I said, 'Well, I'm sorry we had problems, but I'm glad that you got them to keep it,' " and so that was the conversation on it.

rejecting the shipment. A careful reading of the transcript shows, however, that Georgia Vegetable did not state to Relan that there had been a federal inspection. Rather, the most that was proved was that Grice told Relan that Castellini had told him (Grice) that there had been a federal inspection.[4]

In addition to the findings of fact which we find warranted the district court's judgment, the court made the following two findings:

4. The parties have developed a pattern and course of dealing between themselves over a period of many years and the court concludes that these transactions involved in this case were handled in the same or a similar manner to that which they have been using in the past and the defendant is estopped from complaining about any violations of the regulations of the Perishable Agriculture Commodities Act because of that course of dealing.

5. The actions of the parties were in accordance with the established trade customs in the industry as to the handling of all three of the loads and the defendant is estopped to complain about the procedures followed in the handling of these loads of peppers because they do conform to trade custom existing in the industry.

The court treated these findings as estopping the shipper from relying on the regulations. Relan complains that as to number 4, no estoppel was shown, because there is no proof that there was any act or declaration of Relan to support a finding of intended deception, which he says is necessary before an equitable estoppel can arise, citing *Cobb Bank & Trust Co. v. American Mfrs. Mutual Insurance Co.*, 459 F.Supp. 328 (N.D.Ga.1978), *aff'd* 624 F.2d 722 (5th Cir.1980). He also argues that no course of dealing between the parties can be permitted to prevent a shipper like Relan from relying on the mandates of the regulations.

Relan makes the same argument with respect to finding no. 5, dealing with "trade customs," or "customs in the industry."[5]

As stated above, since these findings were unnecessary to support the judgment below, we do not reach these issues. However, since appellant's brief here largely dwells on these arguments, it is not inappropriate to express our grave doubt about the proposition that a usage of the trade could eliminate the effectiveness of the prohibitions of the statute and regulations, which were enacted for the very purpose of preventing the kind of disputes that arose between these parties. *Chidsey v. Guerin*, 443 F.2d 584 (6th Cir.1971); *George Arakelian Farms, Inc.*, 536 F.2d 856 (8th Cir. 1976). Since a usage of the trade becomes an implied term of any contract in the particular trade, whether known to a shipper or not, recognition of such a usage to deny the rights to a new shipper would be tantamount to a *pro tanto* repeal of the statute.

AFFIRMED.

---

**4.** Relan testified that in the telephone conversation the following occurred: "I said, Robert, you call him and tell him to get me a federal inspection on that load of pepper." He said, "The man told me that he had already gotten the federal inspection on it, and that's what he read off of his inspection, that it was 47 percent decay in it."

**5.** In spite of different wording, the trial court was doubtless referring to the "course of dealing" between the parties in no. 4 and to "usage of the trade" in no. 5. These are the terms used in the Uniform Commercial Code O.C.G.A. § 11–1–205.