NATIONAL DISTILLERS & CHEMICAL CORPORATION and Bridgeport Brass Corporation, Plaintiffs-Appellees,

v.

FIRST NATIONAL BANK OF HIGHLAND PARK, as Trustee under Trust No. 3433, Defendant-Appellant.

No. 86–1447.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 5, 1986.

Decided Oct. 31, 1986.

---

Robert F. Fuchs, Vihon, Fuchs, Temple & Berman, Ltd., Chicago, Ill., for defendant-appellant.

Michael J. Wall, Rothschild, Barry & Myers, Chicago, Ill., for plaintiffs-appellees.

Before FLAUM and EASTERBROOK, Circuit Judges, and SWYGERT, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Bridgeport Brass Co. (Old Bridgeport) leased a warehouse in 1960 from the trustee (Landlord) under an Illinois real estate trust. Old Bridgeport promised to maintain the warehouse, pay all taxes, and pay rent. Old Bridgeport had options to extend the lease to 1998. Our dispute arises out of Art. VIII, § 1 of the lease, which provides:

> Assignment or Sub-Lease by Tenant. Tenant agrees not to assign this agreement or its interest herein or hereunder except to a successor to all or substantially all of its business and assets.... Any assignment, except as permitted above, or sublease without the previous written consent of Landlord shall be null and void. Landlord may not arbitrarily or unreasonably withhold consent to assignment or sublease, provided the assignee or sublessee, as the case may be, shall be of financial responsibility reasonably satisfactory to Landlord....

In 1961 Old Bridgeport merged with National Distillers & Chemical Corp., a transaction that was exempt from scrutiny under § 1 (because a merger is not an "assignment") and would in any event have satisfied the terms of that clause (National received "all" of Old Bridgeport's business and assets). In 1984 National, a Fortune 500 firm and therefore a prime tenant, spun off the brass business, which it had

maintained as a division. The spinoff creates difficulties under § 1.

During July 1984 National wrote Landlord about the impending spinoff and requested consent. The letter did not contain any information about the financial structure and prospects of the soon-to-be-independent assets. National and the newly created Bridgeport Brass Corp. (New Bridgeport) closed their transaction on August 17 without waiting for Landlord's written response. On August 30 National wrote Landlord informing it of the assignment and asking again for consent. Under the terms of the lease, if National needed Landlord's assent, it was in default.

In mid-September Landlord received a pro forma balance sheet for New Bridgeport. This unaudited, unsigned document showed that New Bridgeport had assets valued by the author (whoever that was) at some $42 million and debts about $200,000 less. Debt service came in at $6 million or more a year. About $30 million of the debt was secured by the assets. The document did not contain projections of income, disposable cash flows, or operating profits. Landlord replied quickly to this missive, refusing consent on September 23, 1984. The record does not reveal whether National ever supplied additional financial information or whether there were oral exchanges. It does show that on October 3 National wrote to Landlord that it had "determined no consent is required" because the transfer to New Bridgeport conveyed "substantially all of [the brass division's] business and assets". Landlord then sent National a notice that it was in default, which under the lease gave National 30 days to cure—here by ousting New Bridgeport from the warehouse and resuming payment. Instead of doing so National filed this diversity action, seeking a declaratory judgment that Landlord's consent is not required.

Although the principal battleground was the meaning of the first sentence of § 1, the district court granted summary judgment for National on the basis of the third sentence. The court concluded that National had satisfied its burden, see *Arrington v. Walter E. Heller Int'l Corp.*, 30 Ill.App.3d 631, 638–41, 333 N.E.2d 50, 57–58 (1st Dist.1975), of showing that Landlord's decision not to consent was "unreasonable". See *Losurdo Bros. v. Arkin Distributing Co.*, 125 Ill.App.3d 267, 272, 80 Ill.Dec. 348, 352, 465 N.E.2d 139, 143 (2d Dist.1984) (standards for assessing reasonableness include "the credit and financial responsibility" of the subtenant or assignee). The court observed that the monthly rent for the warehouse is $2,453.33, tiny compared with New Bridgeport's $42 million in assets and only half a percent of New Bridgeport's expected monthly expenses. Although Landlord expressed concern about New Bridgeport's lack of a record of paying bills, the court thought that such "reasons are improbable in the context of this case where the proposed assignee holds more than $42 million in assets."

■ It was a mistake to grant summary judgment for National on this record. The party opposing the motion receives the benefit of reasonable inferences. If a jury hearing the evidence adduced in the affidavits could come out either way, summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, —— U.S. ——, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The only pertinent evidence of New Bridgeport's financial responsibility in this record is the pro forma balance sheet. This shows that New Bridgeport had $42 million in assets, securing about $42 million in debt. Debt service would exceed $6 million a year. Whether New Bridgeport could make a go of it would depend on the prospects of the brass business. Yet Landlord had no projections of New Bridgeport's cash flow; without these, it was not able to tell whether there would be money left over, after paying the existing debts, to maintain the warehouse and pay the taxes, let alone pay the rent. It is not irrational for a lessor to be concerned about ending up as a creditor in its tenant's bankruptcy—unable to evict the tenant and unable to collect overdue rent, while senior credi-

tors realize on their security. (Perhaps Landlord could proceed against National as assignor, but a chose in action is not a perfect substitute for a good tenant.)

For all we know, New Bridgeport has been and will be a success and a splendid tenant, but Landlord was entitled to the information necessary to make this decision for itself. It did not have any information, so far as the record shows, until after the assignment had taken place, and it was entitled to stop hunting for information when National took the position that consent was not required. The existing record might well support summary judgment for Landlord. A landlord is entitled to know something about projected income as well as about existing assets, at least when the assets are so encumbered. Thus, we must remand for further proceedings on the issue what Landlord knew (or should have found out) about New Bridgeport by October 3, 1984.*

National's principal argument was that it did not need Landlord's consent. The district judge disagreed, reasoning that National, the tenant under the lease, had not transferred all or substantially all of its assets to New Bridgeport. It transferred only the assets of its Bridgeport Brass Company Division, less than 2% of its total assets (some $1.9 billion). Landlord defends this on appeal by pointing to the "plain language" of the lease and to the fact that it went from having a large and solvent tenant to a fledgling, highly leveraged firm. New Bridgeport is not by any means a continuation of National.

This is not, however, the inevitable reading of the first sentence of § 1. The clause refers to "Tenant", with a capital T, and when the lease was signed Tenant was Old Bridgeport. It is possible that the function of the first sentence of § 1 is to say that so long as the firm holding the group of assets then organized as Old Bridgeport continues to occupy the warehouse, Landlord's consent is unnecessary. The record does not reveal the differences, if there are any, between the operations and assets of Old Bridgeport and New Bridgeport, but the two firms apparently have the same line of business and the same principal plant, a brass mill on 112 acres near Indianapolis. The warehouse in Illinois continues to be used for the same purposes as in 1960. If Old Bridgeport had existed throughout, and had issued new debt in 1984, Landlord would not have had a right to refuse its consent. If Old Bridgeport had become a wholly owned subsidiary of National, and its stock had been sold in 1984 to the same people who own New Bridgeport's stock, Landlord would not have had a right to refuse consent. What is the point of construing the lease to require consent in 1984 just because National made Old Bridgeport a division instead of operating the firm as a subsidiary?

■ Applied to a situation such as this, § 1 has at least two meanings, equally "plain". One is that the tenant on the day of the assignment must transfer all of its assets. The other is that so long as all or substantially all of the assets of Tenant (meaning Old Bridgeport) stay together, the occupant is automatically suitable. Illinois law provides that clauses restricting assignments are to be construed against landlords, on the ground that they restrain the movement of assets to what may be better uses. *Chanslor-Western Oil & Development Co. v. Metropolitan Sanitary District*, 131 Ill.App.2d 527, 530, 266 N.E.2d 405, 408 (1st Dist.1970); Levin, *Withholding Consent to Assignment*, 30 DePaul L.Rev. 109 (1980). We emphasized in *Frandsen v. Jensen-Sundquist Agency, Inc.*, 802 F.2d 941 (7th Cir.1986), that rights of approval are read narrowly because they always complicate and sometimes thwart beneficial transactions. The

---

* Nothing after that date matters, given National's withdrawal of its request. We therefore disregard National's guarantee of New Bridgeport's obligations, a guarantee furnished 15 months into the litigation. Whether it was "reasonable" to reject New Bridgeport depends on what Landlord knew in 1984. The lease had a 30-day period to cure defaults, and perhaps a guarantee tendered during the 30 days after Landlord's demand for cure would have been sufficient. It is quite inappropriate, however, to extend 30 days to 15 months.

lessor's power to block the transfer may stifle improvements, if the parties cannot agree on a price for the landlord's consent; the landlord may try to charge a price that captures the benefits of the change, and so tenants will make fewer beneficial transfers. With the benefit of the doubt, National has a plausible case. Landlord has not suggested any reason why the parties would have negotiated in 1960 for a lease that defined the same bundle of assets— Old Bridgeport's business—as a new tenant just because during an intermediate stage the bundle was merged into a larger firm rather than held as a subsidiary.

■ Landlord's argument implies that the lease contains a ratchet; an increase in Old Bridgeport's assets may not be undone without Landlord's consent. Yet the lease does not contain a clause that would be essential if this were the parties' purpose. They needed a clause stating that if Old Bridgeport should spin off any assets (say, sell half of its business) or acquire new debt, then Landlord had the right to give or withhold approval of continued occupancy. The lease does not contain such a clause— not so far as we know, anyway. (Neither side bothered to put the lease in the record!) Old Bridgeport could have acquired and resold National without Landlord's consent. In corporate law, little or nothing turns on who is denominated the "survivor" in a merger, see *United States Shoe Corp. v. Hackett,* 793 F.2d 161, 163–64 (7th Cir.1986). Under Landlord's interpretation of the lease, everything turns on that designation. Ambiguities and gaps in contracts should be resolved by finding what the parties would have bargained for had they addressed the matter explicitly at the time. Landlord has not suggested that it would have bargained for (or could have gotten) a ratchet clause in this lease.

■ Still, the record does not contain any of the bargaining history of the lease. Landlord suggested at oral argument that there was some. Perhaps the history, or the parties' understanding in 1960, illuminates the meaning of the first sentence of § 1. Illinois law permits resort to evidence

of this sort when the meaning of the contract is in doubt. E.g., *Pioneer Trust & Savings Bank v. Lucky Stores, Inc.,* 91 Ill.App.3d 573, 575–76, 47 Ill.Dec. 36, 38–39, 414 N.E.2d 1152, 1154–55 (1st Dist.1980). More, the need to turn to parol evidence suggests that summary judgment was not appropriate. Perhaps further affidavits will put this case in a position for summary judgment, but if the parol evidence conflicts and questions of material fact remain, there must be a trial. See *Hackett,* 793 F.2d at 166. It is unfortunate when commercial dealings leave a wake of litigation; business works best when the entitlements of the parties are fixed, so that they can bargain against the background of established rights. There is no sufficiently "plain" meaning of the assignment clause, however, so we must remand on this issue as well. Obviously, if the term "Tenant" refers only to the initial tenant (Old Bridgeport), consent was not necessary and the issue of the reasonableness of the refusal to consent is moot. If, however, "Tenant" is the tenant at the time of the transfer (National), the reasonableness issue must be addressed. Because this court lacks the record to decide either issue, we remand.

■ We can, however, remove two issues from the case. First, Landlord accepted two payments from New Bridgeport. New Bridgeport remits monthly still, but Landlord has returned every check since December 1984. National says that the acceptance of the checks "waived" any default. Not so. The concept of waiver by accepting payment "is invoked to avoid a vendor's being able to lull a vendee into not meeting contract terms and then claiming such noncompliance as a breach of the contract." *Vogel v. Dawdy,* 107 Ill.2d 68, 76, 89 Ill.Dec. 836, 840, 481 N.E.2d 679, 683 (1985). So if a landlord accepts checks dated the 15th of each month, he cannot suddenly say that the checks were due the 10th and that the tenant has defaulted. But Landlord's acceptance of two checks did not lull National into making the assignment or failing to cure its default. No

one doubts that either National or New Bridgeport must pay in full for every month's occupancy. It is hard enough for a lessor to forgo income as the price of litigating, which Landlord has done, without making a slipup work a forfeiture.

National's second claim is that even if it erred by assigning without necessary consent, the only consequence is that the assignment is ineffectual. Then it remains the tenant and Landlord cannot cancel the lease. National did not present this argument to the district court, and it is too late to do so now. Just in case National should contend that our remand gives it an opportunity to resuscitate the argument, however, we dispatch the claim. Section 1 of the lease does say that the assignment is "null and void", but if the assignment is void then National has put a subtenant (New Bridgeport) in possession without Landlord's consent and has failed to pay rent for two years. The lease requires cure within 30 days after notice of a default. Landlord gave the notice, identifying as the default New Bridgeport's possession of the warehouse. Instead of curing, National filed this suit. If the court should decide that National needed Landlord's consent and that Landlord was entitled to say no, National does not get *another* 30 days, more than two years after the default began, to cure. National has not cited any Illinois case holding that the filing of a suit extends the period to cure a default. The limited period for cure means that a tenant litigates on its own risk. See *Smith v. Christofalos*, 74 Ill.App.3d 204, 30 Ill.Dec. 101, 392 N.E.2d 756 (2d Dist.1979). If it wants to barge ahead, assign without consent, and cease paying rent, it must take the risk of losing. Otherwise tenants would have landlords at their mercy. They could violate leases and then, after forcing the landlord to go to court, could conform without penalty to the rules they should have been following all along. Landlords would have no remedy for the period of noncompliance, which might put them at great risk (here, two years or more without rent, plus the risk of poor maintenance of the building and nonpayment of taxes).

Tenants could disregard the terms of leases with impunity until courts told them to stop. If National loses, then, default as of 1984 is established, and it must vacate the warehouse or negotiate a new lease with Landlord.

National seems to have a policy of too little, too late. It withheld financial information from Landlord until after assigning the lease; it has yet to provide information about New Bridgeport's income; it guaranteed New Bridgeport's obligations 15 months after withdrawing its request for Landlord's consent; and although it did not raise the argument in the district court it now demands a right to cure any resulting default two years or more after the expiration of the 30 days provided in the lease. National may yet prevail in this litigation, but not on account of diligence.

REVERSED AND REMANDED.