In the Matter of ELCONA HOMES CORPORATION, Debtor–Appellant.

Green Tree Acceptance, Inc., Appellee.

No. 88–1152.

United States Court of Appeals, Seventh Circuit.

Sept. 28, 1988.

William A. Thorne, Thorne, Grodnik & Ransel, Elkhart, Ind., William G. Lavery, for debtor-appellant.

Gary D. Boyn, Warrick Weaver & Boyn, Elkhart, Ind., for appellee.

Before POSNER and COFFEY, Circuit Judges, and WILL, Senior District Judge.[*]

POSNER, Circuit Judge.

This appeal requires us to examine the Bankruptcy Code's provision on set offs, which states that the Code "does not affect any right of a creditor to offset a [prebankruptcy] mutual debt owing by such creditor to the debtor ... against a [prebankruptcy] claim of such creditor against the debtor." 11 U.S.C. § 553(a). The debtor, Elcona Homes Corporation, was (and still is, for this is a reorganization case) a manufacturer of mobile homes. Shortly before it went broke, Linda Markle had ordered a mobile home from one of its dealers, Monro Homes, Inc. The price was $36,700. Markle paid $14,000 down, and Elcona agreed to sell the home to Monro for $22,700. This was, of course, the difference between the retail price and the amount of the down payment; so the latter amount represented Monro's profit.

* Hon. Hubert L. Will, of the Northern District of    Illinois, sitting by designation.

Payment of the balance was to be due when Monro delivered the home to Markle and set it up for her. Green Tree Acceptance, Inc., the creditor in the case, agreed to finance Markle's purchase by giving Monro $22,700 in exchange for an assignment of the installment contract that Monro had signed with Markle. So instead of making her monthly payments to Monro, Markle would make them to Green Tree, and Green Tree's profit would come from the interest it charged Markle. Upon receipt of the $22,700 from Green Tree, Monro would remit an equal amount to Elcona to pay for the mobile home. The parties refer to the type of arrangement by which Green Tree financed Monro's business as "retail proceeds" financing. It bears a family resemblance to the more common "floor-planning" system of dealer financing, but there the lender takes a security interest in the goods before the dealer sells them and here it was afterward.

This was not the first time that Green Tree had financed Monro's sales of Elcona homes; and a practice had developed of Green Tree's paying Elcona directly rather than paying Monro for remittance to Elcona. This meant that instead of Green Tree's paying Monro $22,700 for the installment contract and Monro's then turning around and paying Elcona $22,700 for the mobile home, Green Tree would be expected simply to pay $22,700 to Elcona. Elcona preferred this arrangement, since it protected it (how far we shall see) against the risk of Monro's defaulting. This was not only the practice between the parties but also, they have stipulated, the practice generally followed in the mobile home industry.

Elcona's bankruptcy occurred after the sale to Markle but before Green Tree had paid Elcona. Now it happened that Elcona owed Green Tree $16,000 (more or less) on an earlier transaction. Green Tree decided to set off this debt against the $22,700 that normally it would have sent directly to Elcona, and therefore sent Elcona only the difference between $22,700 and $16,000 (actually somewhat less, but like the exact amount owed Green Tree in the earlier transaction, that is a detail of no importance to this appeal). The bankruptcy

judge did not consider this a proper set off. Since the $22,700 was not a debt that Green Tree owed Elcona but a debt it owed Monro, there was no mutual indebtedness between Elcona and Green Tree, as the statute requires. (Elcona adds that Green Tree was really just an escrow agent of Monro, Elcona's real debtor.) The district judge (after a procedural bobble recounted in *In re Elcona Homes Corp.*, 810 F.2d 136 (7th Cir.1987)) reversed the bankruptcy judge. He thought the evidence showed "a mutuality of obligations between Green Tree and Elcona and vice versa because it was both the industry practice and the practice between the parties for the lender (Green Tree) to pay the manufacturer (Elcona) directly the amount due the manufacturer from the dealer. That being the case, Green Tree was entitled to setoff the debt owed it by Elcona." Elcona appeals.

The set-off provision in the Bankruptcy Code seems at first glance inconsistent with the usual result in bankruptcy, which is that all unsecured creditors are treated alike ("equity is equality"). But it is no more than the usual result precisely because the principle that unsecured creditors shall be treated alike is riddled with exceptions. There are all sorts of preferences (for the Internal Revenue Service, for employees having wage claims, for persons who extend credit to the debtor after the petition for bankruptcy is filed, etc.) and discriminations (e.g., against creditors treated preferentially on the eve of bankruptcy). And it might be more accurate to say not that there is a principle (however qualified) of equal treatment among creditors but that bankruptcy provides a mechanism for enforcing pre-bankruptcy entitlements given by state or federal law, with some exceptions. But the idea of equal treatment is a useful as well as persistent one. An important purpose of bankruptcy law is to prevent individual creditors from starting a "run" on the debtor by assuring them that they will be treated equally if the debtor is precipitated into bankruptcy, rather than being given either preferential treatment for having jumped the gun or disadvantageous treatment for having hung back.

The principle is not absolute, as we have stressed, but its exceptions generally are intelligible; and we will be helped in determining the scope of the set-off exception—which on its face is arbitrary—if we can understand its rationale, too.

Set offs outside of bankruptcy are in no wise anomalous or problematic; no third party's rights comparable to those of unsecured creditors in bankruptcy are affected, and circuitous proceedings are avoided. But in bankruptcy an unsecured creditor fortunate enough to owe his debtor as much as or more than the debtor owes him can, by setting off his debt against the debtor's, in effect receive 100 cents on the dollar, while the other unsecured creditors, who have nothing to set off against the debtor, might be lucky to collect 10 cents on the dollar. The difference in treatment seems based on a fortuitous difference among the unsecured creditors, and therefore arbitrary. Let us inquire further.

Although the right of set off has been a part of Anglo–American bankruptcy law since 1705, see Act of 4 Anne, ch. 17, § 11, its rationale has never been made clear. To say that it "recognize[s] the possible injustice in compelling a creditor to file its claim in full and accepting possible dividends thereon, while at the same time paying in full its indebtedness to the estate," 4 Collier on Bankruptcy ¶ 553.02, at p. 553–10 (King 15th ed. 1988) (footnote omitted), is to say very little; for why is it not an equal or greater injustice to advance one unsecured creditor over another merely because the first happens also to owe money to their common debtor? Nor is it helpful to point out that "it is only the balance which is the real and just sum owing by or to the bankrupt," *Prudential Ins. Co. v. Nelson*, 101 F.2d 441, 443 (6th Cir.1939), for if the set off is allowed, the other unsecured creditors will not receive "the real and just sum owing" to them.

The only sense we can make of the rule is that it recognizes that the creditor who owes his debtor money is like a secured creditor; indeed, the mutual debts, to the extent equal, secure each party against the other's default. This reasoning figured in Congress's decision to retain the right of set off in the 1978 overhaul of bankruptcy law. See the useful discussion in Comment, *Setoff in Bankruptcy: Is the Creditor Preferred or Secured?*, 50 U.Colo.L. Rev. 511, 519–23 (1979). The reasoning may seem circular, however, for it is only by virtue of the Bankruptcy Code's preserving the right of set off that the creditor has, in the event of his debtor's bankruptcy, a form of security for the debt he is owed. (But of course not all defaulting debtors are bankrupt.) And one might suppose that if the theory of the set off is that it provides the creditor with security, the creditor would have to prove that the parties had intended a right of set off as a means of securing the creditor—that is, would have to prove that the creditor had been counting on the right in extending credit to the debtor on the terms he did. See *Columbia Aircraft Co. v. United States*, 163 F.Supp. 932, 934 (S.D.N.Y.1958) (L. Hand, J.). But such proof is not in fact required.

Banks argue that the right to set off deposits (a bank deposit is a debt of the bank to the depositor) against the depositor's debts to the bank facilitates the provision of bank credit and lowers the rate of interest, by giving the bank security in the event of the depositor's going broke. But the more secure the bank is, the less secure the depositor's other creditors will be, so they will charge higher interest rates. This, however, is a general characteristic of secured lending. The secured lender faces a lower risk of loss in the event of default and therefore will lend at a lower interest rate, but unsecured lenders, facing a higher risk of loss because fewer assets will be available to satisfy their claims in the event of default, will charge higher interest rates. Nevertheless secured financing is so firmly established a commercial practice that it is hard to believe it does not serve important commercial purposes, and it is apparent what they might be: lenders differ in their ability to monitor their borrowers (in order to prevent the borrower from increasing the riskiness of its activities) and to bear risk, and thus a combination of secured and unsecured financing enables a

borrower to appeal to the different capabilities and preferences of different lenders.

■ Yet if deposits are intended to secure the bank's loans, why not treat the bank as a secured creditor rather than creating a general right in all creditors to set off their debts against the bankrupt's debts to them? Maybe the answer is simply that set offs are just another form of secured financing that the Bankruptcy Code has decided to recognize, though under a different name and with different restrictions. But the underlying rights of creditors which are asserted in bankruptcy proceedings are the creation of state law, not of the Bankruptcy Code; for the general principle see *Butner v. United States*, 440 U.S. 48, 54–57, 99 S.Ct. 914, 917–19, 59 L.Ed.2d 136 (1979), and for its application to set offs see *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562, 565 (7th Cir. 1986). Maybe the right question to ask, therefore, is not why the Code allows set offs (for it also allows secured creditors to withdraw their collateral from the pool available to other creditors), but why it places restrictions on them. Against this view of set offs as a species of secured financing, however, it can be argued that, apart perhaps from such special situations as that of banks dealing with their depositor-borrowers, set offs are recognized in state law for their procedural convenience —the consolidation of offsetting claims in the same suit—and that this convenience should receive little weight in bankruptcy. Professor Gilmore thought the express exemption of set offs from the filing requirements in Article 9 (secured financing) of the Uniform Commercial Code, see § 9–104(i), absurd: "Of course a right of setoff is not a security interest and has never been confused with one: the statute might as appropriately exclude fan dancing." 1 Gilmore, Security Interests in Personal Property § 10.7, at pp. 315–16 (1965). This view seems extreme and has been questioned, see Clark, The Law of Bank Deposits, Collections and Credit Cards ¶ 11.3 (rev. ed. 1981); see also *id.*, ¶ 1.8[9]; 4 Collier on Bankruptcy, *supra*, ¶ 553.15[1], but certainly there is no evidence here that the existence of mutual debts (if that is what they were) between Elcona and Green Tree reflected a desire by the parties to secure each other's obligations; it appears to have been an accident.

■ But we need not resolve these questions, or press our inquiry into the rationale for the Bankruptcy Code's treatment of set offs further, in order to decide this case. Whether that treatment reflects a felt tension between the right of set off and the normal practice in bankruptcy of treating unsecured creditors equally, or whether one denies the tension, points out that the recognition by state law of a right of set off makes the set off a form of secured financing, and argues (contrary to our earlier point) that there really is no policy of treating unsecured creditors in bankruptcy equally, the statute itself speaks of "a *mutual* debt" (emphasis ours), see 4 Collier on Bankruptcy, *supra*, ¶¶ 553.04[1], [2], and therefore precludes "triangular" set offs. See, e.g., *In re Berger Steel Co.*, 327 F.2d 401 (7th Cir.1964); *Depositors Trust Co. v. Frati Enterprises, Inc.*, 590 F.2d 377, 379 (1st Cir.1979); *In re Virginia Block Co.*, 16 B.R. 771 (Bankr.W.D.Va. 1982).

Two recurrent cases should be noted. In the first and easier, illustrated by *In re Southern Industrial Banking Corp.*, 809 F.2d 329 (6th Cir.1987), the creditor of a bankrupt buys a debt owed by someone else to the debtor in order to offset the debt that the bankrupt debtor owes him and so gain an advantage over the other unsecured creditors. This is plainly evasive and easily rebuffed. Indeed, it will normally violate 11 U.S.C. § 553(a)(3), which was added in 1978 to close a loophole that had allowed preferences in the form of set offs, and which forbids a set off where the debt was incurred within 90 days before bankruptcy, while the debtor was insolvent, and for the purpose of obtaining a set off against him. See *In re Prescott*, 805 F.2d 719, 730 (7th Cir.1986); *In re Dayton Circuit Courts No. 2*, 80 B.R. 434, 439–40 (Bankr.S.D.Ohio 1987).

In the second case, illustrated by both *Berger Steel* and *Depositors Trust*, a subsidiary or other affiliate of the creditor owes money to the bankrupt and the two affiliates ask that they be treated as a

single entity. This is rebuffed by pointing out that, save in exceptional circumstances, corporate and commercial law treat affiliated corporations as separate enterprises. See, e.g., *In re Xonics Photochemical, Inc.,* 841 F.2d 198, 201 (7th Cir.1988); *In re Kaiser,* 791 F.2d 73, 75 (7th Cir.1986).

Our case follows neither of these familiar patterns. It is neither a transaction in contemplation of bankruptcy (the timing suggests it may be but Elcona does not argue the point, and it is therefore waived) nor an attempt by affiliated corporations to lift the corporate veil that separates them. Nevertheless there can be no set off unless the $22,700 was in fact a debt owed by Green Tree to Elcona. See, e.g., *In re Fasano/Harriss Pie Co.,* 43 B.R. 864, 870–71 (Bankr.W.D.Mich.1984), aff'd, 70 B.R. 285 (W.D.Mich.1987), aff'd without opinion, 848 F.2d 190 (6th Cir.1988); *Bloor v. Shapiro,* 32 B.R. 993, 1001–02 (S.D.N.Y.1983).

■■ The district court's opinion does not deal satisfactorily with this issue. The court inferred the existence of a mutual debt from the practice of the parties and of the industry; indeed, he equated obligation to practice. He said, "there was a mutuality of obligation between Green Tree and Elcona and vice versa *because* it was both the industry practice and the practice between the parties for the lender (Green Tree) to pay the manufacturer (Elcona) directly the amount due the manufacturer from the dealer. *That being the case,* Green Tree was entitled to setoff the debt owed it by Elcona." (Emphasis added.) In other words, a practice equals or creates an obligation. It does not. See, e.g., *In re Virginia Block Co., supra,* 16 B.R. at 774. Suppose the practice of a landlord is to accept late payment from his tenant. That practice does not entitle the tenant to pay late; it does not modify the contract. If every forbearance to enforce a contract to its hilt operated to modify the contract against the party exercising forbearance, such forbearance would become rare; promisees would always insist on exact performance of the promisor's obligation, and defaults and litigation would become more frequent. See *In re Xonics Imaging, Inc.,* 837 F.2d 763, 767 (7th Cir.1988). A practice may be evidence of an obligation, may give meaning to vague terms, and so on; but it is not the equivalent of it. See UCC § 1–205; Farnsworth, Contracts § 7.13 (1982).

The question can be put this way: if, instead of remitting $22,700 directly to Elcona, Green Tree had remitted the money to Monro, and Monro had absconded with the money without paying Elcona, could Elcona have sued Green Tree? Possibly so, since as we said the practice of Green Tree in remitting directly to Elcona provided both parties with security against a default by the dealer, and the security would be less if the contract were interpreted to allow either party to disregard the practice. Maybe, then, the practice was also an implied term of the contract. If so—and if, therefore, Elcona could have sued Green Tree (and won) in our hypothetical case—this would show that Green Tree was indeed indebted to Elcona, and then the debts were mutual and could be offset. The case must be remanded for a determination whether there was not only a practice of direct payment from the finance company to the manufacturer but an obligation to make such payments.

The reader may be wondering about the possibility that Elcona was a third-party beneficiary of the contract between Green Tree and Monro. If so, this would show that Green Tree had indeed been indebted to Elcona for the $22,700 and thus that there were offsetting debts. Such at least is the holding of *In re Bacigalupi, Inc.,* 60 B.R. 442, 446 (9th Cir.Bank.App.Panel 1986). But *In re J.A. Clark Mechanical, Inc.,* 80 B.R. 430, 433 (Bankr.N.D.Ohio 1987), holds that third-party beneficiary status cannot give rise to a right to set off in bankruptcy. These decisions give no reasons for their opposed conclusions, and we can find no other decisions on the question. We need not take sides; Green Tree does not argue to us that Elcona was a third-party beneficiary, and we shall leave it to the district court to decide (at least in the first instance) whether the argument has been waived below and if not whether

it is a valid argument. Nor need we at this stage determine the limits on a bankruptcy court's discretion to disallow a set off that is within the terms of the statute; possibly it extends no further than to disallow a set off acquired for the purpose of stealing a march on other creditors, for as Judge Friendly has reminded us "the rule allowing setoff, both before and after bankruptcy, is not one that courts are free to ignore when they think application would be 'unjust.' " *In re Applied Logic Corp.*, 576 F.2d 952, 957 (2d Cir.1978). See generally *Gardner v. Chicago Title & Trust Co.*, 261 U.S. 453, 43 S.Ct. 424, 67 L.Ed. 741 (1923); *United States on Behalf of Internal Revenue Service v. Norton*, 717 F.2d 767, 772 (3d Cir.1983); *In re Southern Industrial Banking Corp.*, supra, 809 F.2d at 332; *In re Elsinore Shore Associates*, 67 B.R. 926, 946 (Bankr.D.N.J.1986).

Green Tree, curiously, argued in its brief that the district court had not erred in lifting the automatic stay. However, since Elcona did not raise the issue in its opening brief, the issue was waived. The appellee was not, and we are not, required to address it.

The decision of the district court is vacated and the case remanded for further proceedings consistent with this opinion.

WILL, Senior District Judge, dissenting.

While I agree with much of the majority opinion, I do not agree that the case in the words of the majority opinion "must be remanded for a determination whether there was not only a practice of direct payment from the finance company to the manufacturer but an obligation to make such payments." With all due respect, Judge Lee has already done just that. In his opinion he said:

> In this court's view, the stipulations differentiate the facts in this case from those presented in either *Virginia Block* or *Inland Steel*, even apart from the fact that in this case the court is not dealing with debts of subsidiary corporations. Here, unlike in *In re Virginia Block*, the practice was not "occasional" or "sporad-

ic at best" nor was the arrangement here superceded by a "written blanket" agreement as it was in *Inland Steel*. Rather, the evidence in the record and the parties' stipulation clearly shows that there was a *mutuality of obligations* between Green Tree and Elcona and vice versa *because it was both the industry practice and the practices between the parties* for the lender (Green Tree) to pay the manufacturer (Elcona) directly the amount due the manufacturer from the dealer. That being the case, Green Tree was entitled to setoff the debt owed it by Elcona.

District Court Opinion at 9–10 (emphasis added).

I am not clear what more the majority would have him say. The majority opinion suggests that a "practice may be evidence of an obligation ... but it is not the equivalent of it." In this connection, it asserts that the acceptance by a landlord of a late payment from a tenant does not modify the lease. But the cases are legion holding that a landlord who regularly accepts late payments from a tenant cannot thereafter claim that a subsequent late payment constitutes a breach of the lease. *American National Bank & Trust Company v. Dominick*, 154 Ill.App.3d 275, 107 Ill.Dec. 599, 507 N.E.2d 512, 515–16 (1987); *Vogel v. Dawdy*, 107 Ill.2d 68, 89 Ill.Dec. 836, 840, 481 N.E.2d 679, 683 (1985) ("waiver is applied in 'late payment' cases ... to avoid a vendor's being able to lull a vendee into not meeting contract terms and then claiming such noncompliance as a breach of the contract."); *National Distillers v. First National Bank*, 804 F.2d 978, 980 (7th Cir. 1986) (*citing Vogel*); *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir.1984) (interpreting California law); *In re Ferris*, 415 F.Supp. 33, 38 (W.D.Okl.1976).

> The general rule is that if a party to a contract performs acts that recognize the contract as still subsisting, such as accepting rent payments, specific performance of the terms of the contract is waived and there can be no forfeiture.... This rule is founded on principles of common honesty: a landlord cannot take the position [that] a lease is

valid for one purpose, e.g., collection of rent, and yet declare it invalid for other purposes.

*Page Two, Inc. v. P.C. Management, Inc.*, 517 N.E.2d 103, 106 n. 1 (Ind.App.Ct. 2d Dist.1987) (citations omitted).

The majority cites *Matter of Xonics Imaging Inc.*, 837 F.2d 763, 767 (7th Cir.1988) for the proposition that parties should not be discouraged from exercising forebearance for fear that their action will modify a contractual obligation. While this is one policy consideration, it by no means negates the contrary policy consideration, adopted in the cases cited above and many others, that one may reasonably act in reliance on another's *repeated forebearance* as effectively modifying even a written contractual obligation. The line is drawn based on the nature of the obligation and the nature and frequency of the forebearance. Certainly, *Matter of Xonics Imaging Inc.* can not be understood as overruling the large and established body of law regarding waivers and forbearance. Accordingly, with all due respect, the policy consideration referred to in *Matter of Xonics Imaging Inc.* is not dispositive of this case.

Moreover, we deal here not with the modification of a written contract such as a lease, but with whether, absent a written contract, a uniform practice followed both in the industry and by the parties can create a mutual obligation, as Judge Lee found it had in this case. Again, there is substantial precedent that it can.

The very section of the Uniform Commercial Code cited by the majority provides in relevant part:

(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question.

(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

U.C.C. § 1–205. *See, e.g., McGhan v. Ebersol*, 608 F.Supp. 277, 285 (S.D.N.Y. 1985) (misapproportion of ideas case: "An implied-in-fact contract may be based upon industry custom or usage regarding submission and use of ideas."); *Marwil v. Baker*, 499 F.Supp. 560, 573 (E.D.Mich. 1980) (an employee's contractual rights can be based on rules, customs and policy statements of the employer: "[R]ules and customs may create binding contractual obligations."). In addition, evidence of a trade custom may be used to determine how damages should be calculated. *Hams Express, Inc. v. Joseph Land & Co., Inc.*, 506 F.Supp. 209, 214 (E.D.Pa.1980) (trade practice determines compensation for a consignee or shipper due to carrier's negligence); *Havenfield Corporation v. H & R Block, Inc.*, 509 F.2d 1263, 1270–71 (8th Cir.1975).

> An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather *is inferred from the conduct of the parties in the milieu in which they dealt.*

*Bloomgarden v. Coyer*, 479 F.2d 201, 208 (D.C.Cir.1973) (footnote omitted; emphasis added), *cited with approval in Lirtzman v. Fuqua Indus., Inc.*, 677 F.2d 548, 551–52 (7th Cir.1982), and *Overseas Development Disc Corp. v. Sangamo Constr. Co. Inc.*, 840 F.2d 1319, 1330 (7th Cir.1988). Here all parties were active members of the same general industry—mobile homes—and all parties agree that there was both an industry custom and a regular course of dealing among the parties themselves. The parties' conduct, in conformity with the industry custom and their regular course of dealing, established an implied-in-fact contract that the lender (Green Tree) would pay the manufacturer (Elcona) directly.

The majority cites *In re Virginia Block Co.*, 16 B.R. 560, 562 (Bankr.W.D.Va.1981) in support of its conclusion that a practice does not equal or create an obligation. Like Judge Lee, we have no disagreement with the result in *Virginia Block,* given the facts of that case. Virginia Block, the debtor, was a company which conducted several transactions with four defendants: corporate defendants Bushong Realty and Pulaski Motor Co., Inc. which were wholly owned by individual defendants Charles Bushong and Miller Bushong. 16 B.R. at 561. Virginia Block maintained separate records of its transactions with each defendant. However, "a practice of offsetting mutual accounts receivable" continued among the parties until Virginia Block filed for bankruptcy. *Ibid.* Although the bankruptcy court opinion does not expressly say so, it appears that the attempted offsetting of mutual accounts receivable related to the accounts receivable on the four defendants' records, as a whole, against the aggregate accounts receivable on Virginia Block's records with respect to all four defendants. This practice was not embodied in a written contract but, instead, developed as a result of the friendship between the Bushongs and Virginia Block's vice president. *Ibid.*

After Virginia Block filed for bankruptcy, the four defendants apparently attempted to set off their aggregate accounts receivable from the bankrupt against the aggregate debts owed to the bankrupt. The bankruptcy court denied the defendants' claimed combined set off on the grounds that each defendant was a separate entity.

> [I]t is clear in this proceeding that the debts are not mutual debts within the meaning of § 553. Even though the parties continued a friendly working relationship over their years of association, their practice of disposing of the accounts at one meeting does not transform the individual accounts into the account of a single entity. Each debt was incurred by the respective customer in his or its own right. Virginia Block maintained separate accounting of the amounts due in the name of the customer. Likewise, a claim held by the customer, namely the claim of Pulaski Motor Co., Inc., is a claim of that individual entity alone.

*Id.* at 562. Because the defendants sought a "triangular tradeoff," the bankruptcy court denied their claim. *Ibid.* The court did not, however, deny each defendant the right to set off his or its debt against Virginia Block's claim. It simply denied lumping them all together.

Contrary to the majority opinion, *Virginia Block* does not stand for the proposition that a regular practice cannot create an obligation. The issue in *Virginia Block* was not whether an obligation was created by virtue of the parties' practice. Instead, the issue was whether the parties' practice of "comingling" their accounts receivable at periodic settlement meetings transformed the four defendants into one legal entity for the purpose of set offs. The bankruptcy court in *Virginia Block* correctly noted that the law distinguishes between partnerships and individual partners and between corporations, their shareholders and their subsidiaries. 16 B.R. at 562, *citing* 4 *Collier on Bankruptcy* ¶ 553.04[4] at 553–31 (15th ed. 1980) and *Inland Steel Co. v. Berger Steel Co., Inc.,* 327 F.2d 401, 403–04 (7th Cir.1964). The defendants in *Virginia Block* attempted to bypass this distinction.

In contrast, the facts in our case do not raise the issue of distinguishing between related companies or individuals and partnerships. There is no suggestion that Monro and Green Tree are related companies. Moreover, they regularly and frequently transacted business in conformity with an industry custom and established course of dealings. The question here is whether that conduct created an implied-in-fact contract and, therefore, an obligation. I agree with Judge Lee that it did.

Conduct generally observed by members of a trade binds both parties because each is justified in assuming that the trade practice will be observed unless the other party indicates otherwise.

A party is always held to conduct generally observed by members of his chosen

trade because the other party is justified in so assuming unless he indicates otherwise. He is held to more general business practices to the extent of his actual knowledge of those practices or to the degree his ignorance of those practices is not excusable: they were so generally practiced he should have been aware of them.

*Nanukuli Paving & Rock Co. v. Shell Oil Co., Inc.*, 664 F.2d 772, 791 (9th Cir.1981). *See also Gord Indus. Plastics, Inc. v. Aubrey Mfg., Inc.*, 127 Ill.App.3d 589, 82 Ill. Dec. 855, 858, 469 N.E.2d 389, 392 (1984) ("... parties may be charged with knowledge of any usage or custom in the trade 'of which they are or should be aware.'") (citations omitted); *Georgia Vegetable Co., Inc. v. Relan*, 731 F.2d 798, 804 (11th Cir. 1984) ("[U]sage of the trade becomes an implied term of any contract in the particular trade, ...").

As the majority opinion *almost* recognizes, Elcona could have sued Green Tree if, contrary to the established practice, the latter had paid Monro and Monro had failed to pay Green Tree. As the cases cited demonstrate, the courts have recognized that, absent a written contract, binding mutual obligations, an implied-in-fact contract, can be created by established and regularly followed industry practices. It seems to me clear, as Judge Lee has already found, that such mutual obligations were created here.

Since the facts as stipulated by the parties and found by Judge Lee support his legal conclusion that there was an obligation on Green Tree's part to remit directly to Elcona, his ultimate conclusion that there were mutual debts under 11 U.S.C. § 553(a) was correct. Accordingly, I would affirm his decision rather than remanding for him to adumbrate in greater detail the conclusion he has already correctly reached.