In the Matter of FASANO/HARRISS PIE COMPANY, Debtor.

WALTER E. HELLER & COMPANY and Richard C. Remes, Trustee, Plaintiffs,

v.

FOOD MARKETING ASSOCIATES, LTD., Defendant.

Bankruptcy No. HK 82 01553. Adv. No. 82 0996.

United States Bankruptcy Court, W.D. Michigan.

Oct. 10, 1984.

Larry Ver Merris, Grand Rapids, Mich., for plaintiffs.

Robert D. Mollhagen, Kalamazoo, Mich., Douglas R. Beach, St. Louis, Mo., for defendant.

## OPINION

LAURENCE E. HOWARD, Bankruptcy Judge.

This action was commenced by Walter E. Heller & Company ("Heller"), the holder of a perfected security interest in the accounts receivable of the debtor, Fasano/Harriss Pie Company ("Fasano/Harriss")[1] and Richard C. Remes, the duly appointed Chapter 7 trustee in this case, to recover $36,340.04 for frozen pies allegedly sold by the debtor, a Michigan corporation, to Food Marketing Associates, Ltd. ("FMA"), a Missouri corporation.

---

1. An involuntary chapter 7 petition was filed against Fasano/Harriss on May 10, 1982. By order of this Court entered on July 27, 1982, Heller was granted relief from the automatic stay and was authorized to collect the debtor's outstanding accounts receivable pursuant to its security interest.

The facts concerning the underlying relationship of the parties and transfer of pies are as follows. FMA operates as an institutional food broker in the state of Missouri. Paul Phillips, president of FMA, testified by way of deposition that as broker FMA does not directly sell, ship or warehouse any product but rather represents the sale to a customer, the distributor. (depo. at 6) The usual method of operation is for a customer to place an order for a certain product with FMA and for FMA to contact the principal-manufacturer, confirm the order and make certain that the product is shipped to the customer. (depo. at 6, 15) The principal bills the appropriate customer directly and FMA receives its brokerage fees from the principal after the invoice is paid by the customer. (depo. at 15, 16)

Before Fasano/Harriss ceased operations on March 29, 1982, it was in the business of selling frozen desserts and pies. In April, 1982, the debtor received and serviced two separate orders for frozen pies for a combined invoice price of $36,340.04.[2] Both invoices list the defendant as the broker and Foodservice Center, Inc. ("FSC"), a Missouri corporation, as the customer. The record is unclear as to who actually placed these orders with the debtor.[3] Mr. Phillips testified that his company dealt and ordered directly with an entity called Fasano Pie Company ("Fasano") based in Chicago, Illinois, and not with the debtor. (depo. at 6–8, 28)

The president of FSC, James Volansky, testified, also by way of deposition, that although his company had ordered the debtor's products in the past from FMA as the debtor's exclusive broker (depo. at 5–9), FSC did not place the two orders previously mentioned (depo. at 15, 16) and had switched suppliers of pie products prior to the date of these orders. (depo. at 19) When the pies pursuant to the first purchase order arrived at FSC's facilities, delivery was refused and the carrier was referred to the defendant. (depo. at 18)

Upon receipt of a call from the carrier of the pies, Mr. Phillips instructed him to place the product in cold storage. (depo. at 18–19) Numerous attempts were made by Mr. Phillips to contact Fasano in Chicago to determine what should be done with the pies but no reply was received. (depo. at 19) The identical course of events transpired with a second shipment of pies from the debtor under the second purchase order which occurred approximately one week later. (Phillip's depo. at 31, Volansky's depo. at 21) Ultimately, on April 22, 1982, the pies were sold by FMA to Food Products International, Inc. ("Food Products") for $26,088.41. (depo. at 21–23, answ. to interrog. # 3)

The complaint seeks recovery on the accounts receivable due and owing in the amount of $36,340.04.[4] The parties stipulated that neither invoice has been paid despite a demand letter from Heller to the defendant seeking payment. (trans. at 6–8) FMA defends this action by asserting that:

---

**2.** Although the debtor was no longer producing pies at this time, it was liquidating its inventory to satisfy its debt. (trans. at 10, 11) At a trial held on this matter on May 2, 1984, Jack Grilley, the debtor's former distribution manager, testified that he had prepared the bills of lading for the two orders (exhs. 6 & 9) and that the pies were shipped pursuant to each order respectively on April 12, 1982, and April 16, 1982, to Foodservice Center. (trans. at 56, 58–60)

**3.** David Johnson, former manager of the debtor, testified at trial that he had participated in preparing the two purchase orders from information supplied to him from another former employee of the debtor, Mr. Burkis, and consequently had no personal knowledge of who actually placed the orders with the debtor. (trans.

at 16, 33, 45) Mr. Johnson did indicate his belief however, upon reviewing the purchase orders, that the first order originated from FMA and the second order originated from Tom Boyle, who he identified as a master broker for the debtor through which specific brokers, such as FMA, placed orders. (trans. at 34, 49, 50) Mr. Phillips however, could not recall any business being transacted between his company and Mr. Boyle. (answ. to interrog. # 9)

**4.** The complaint was amended to assert a second count for fraud alleging that the defendant's orders for pies were fictitiously placed. The plaintiffs have presented no clear evidence supporting this claim thus precluding any recovery on this basis.

1) no contract had been formed between the parties, 2) its liability, if any, is limited to $18,718.16, the amount that FMA ultimately received for the pies in question, and 3) it is also entitled to a setoff in the amount of $16,457.88 which allegedly represents a judgment in favor of the defendant against Fasano for uncollected brokerage fees.

## I. CONTRACTUAL LIABILITY

The record indicates that the defendant, as broker, ordered pies from Fasano which orders were eventually serviced by the debtor. While admittedly, there is a void in the evidence as to who placed the orders with the debtor, it is reasonable to assume that the orders were transmitted by Fasano. The contractual liability of the defendant ultimately rests on which of two possible scenarios the Court views the facts.

■ Under the first scenario, Fasano entered into an independent contractual relationship with the debtor. It is hornbook law that an offer may only be accepted by the party to whom it is made. *See Grant v. Naylor,* 4 Cranch (U.S.) 224, 2 L.Ed. 222 (1808); *Ott v. Home Savings & Loan Association,* 265 F.2d 643 (9th Cir.1958).

> Accordingly, a purported acceptance of an offer, either by reply or attempted performance, by one other than the offeree, to whom the latter has in some manner communicated knowledge of the offer, is ineffectual to complete a valid contract.... To constitute a valid contract, the minds of the parties must have met on the identity of the persons with whom they are dealing.

17 Am.Jur.2d Contracts § 42 at 380. This rule is premised on the notion that the offeror is the master of his offer, *Kroeze v. Chloride Group Ltd.,* 572 F.2d 1099 (5th Cir.1978), and accordingly has "a right to select with whom he will contract, and can-

not have another person thrust on him without his consent." 17 Am.Jur.2d Contracts § 17 at 353. *See also Arkansas Valley Smelting Co. v. Belden Mining Co.,* 127 U.S. 379, 8 S.Ct. 1308, 32 L.Ed. 246 (1888); *Potucek v. Cordeleria Lourdes,* 310 F.2d 527 (11th Cir.1962), *cert. den.* 372 U.S. 930, 83 S.Ct. 875, 9 L.Ed.2d 734 (1963).

In *National Crankshaft Company v. National Gas Industries, Inc., et al.,* 158 So.2d 370 (La.Ct. of App.1963), the defendant ordered a reconditioned crankshaft from a third party with whom it had done business for many years. The shipment was made instead by the plaintiff, without the knowledge of the defendant. Only after the crankshaft was installed in the defendant's machinery was the defendant informed of the true supplier. Under these facts the Court denied any recovery on the basis of contractual liability.

To be distinguished, however, is the situation where the offeror accepts the goods and uses them with knowledge that the supplier was other than the offeree. *See Cincinnati Siemens-Lungren Gas Illuminating Co. v. Western Siemens-Lungren Co.,* 152 U.S. 200, 14 S.Ct. 523, 38 L.Ed. 411 (1894). To avoid contractual liability, the appropriate course of action in such a case would be for the offeror to return the goods and decline to have any dealings with the third party. *Id.* 152 U.S. at 202, 14 S.Ct. at 524. *See also* 67 Am.Jur.2d Sales § 98 at 213.

■ There is no direct evidence that FMA was aware, at any time before the pies were eventually sold, that it was dealing with Fasano/Harriss rather than Fasano Pie Co.[5] Circumstantial evidence indicates that such actual knowledge cannot be attributable to the defendant. The defendant instructed the carrier to place the pies in cold storage under the name of Fasano Pie Co.[6] In the meantime, the defendant

---

**5.** The plaintiffs rely on the fact that Mr. Phillips admitted to receipt of copies of correspondence from Mr. Volansky to the debtor and copies of the debtor's invoices both of which bore the debtor's name and address in Michigan. (depo. at 27, 28) While this might be sufficient to find

that the defendant was placed on constructive notice of Fasano/Harriss' involvement in the deliveries at issue, the court does not deem this sufficient for purposes of contract formation.

**6.** While the pies were originally stored in Fasano Pie Co.'s name, they were subsequently

awaited instructions from Fasano Pie Co. after making numerous efforts to contact its officers. Additionally, Mr. Phillips testified that it was not unusual for Fasano Pie Co. to ship goods from places other than Chicago since it had warehouses located elsewhere. (depo. at 24) Accordingly, without knowledge that it was dealing with the plaintiff, the defendant cannot be held contractually liable under the first scenario.

Under the second scenario, Fasano Pie Co. acted as agent for the debtor, its undisclosed principal. The general rule is, absent a personal service contract, reliance on the personal qualities of the agent or the like, "[a] contract entered into by an agent for or on behalf of an undisclosed principal, is the contract of the undisclosed principal, and by appearing and claiming the benefit of the contract, it thereby becomes his own.... The fact that...the other party to the contract was unaware of the agency relationship, does not preclude enforcement of the contract by the undisclosed principal." 3 C.J.S. Agency § 448 at 320. *See also Socomet, Inc. v. City of Detroit,* 33 Mich.App. 626, 190 N.W.2d 551 (1971). Michigan courts follow the general rule than an undisclosed principal may sue in his own name on a contract made in his behalf. *American Enameled Brick & Tile Co. v. Brozek,* 251 Mich. 7, 231 N.W. 45 (1930). (Although being contractually liable under this scenario, FMA would be potentially entitled to setoff against the plaintiff any debt or claim it had against Fasano Pie Co. which arose before it acquired notice of the agency. See *Id.* 251 Mich. at 10, 231 N.W. 45; 3 C.J.S. Agency § 450. FMA's right of setoff will be discussed in more detail *infra* Part III.)

Upon the facts, the Court cannot find either an express agency [7] or an agency by estoppel.[8] Of greater concern is whether the conduct of Fasano and the debtor gave rise to an implied agency. The District Court for the Western District of Michigan has recognized, "[w]ithout an express appointment and acceptance, the creation of an agency may be implied from the words and conduct of the parties and the circumstances of the particular case," *Van-Koevering v. Manufacturers Life Co.,* 234 F.Supp. 786, 791 (W.D.Mich.1964) *citing* 1 MPL Agency § 5 at 309, as where one holds out another to be his agent by investing him with ostensible authority. *Id.* The existence of an implied agency must be supported by a finding that the agent was acting in behalf of his principal and with the knowledge or consent of the latter. *United States v. Marroso,* 250 F.Supp. 27, 30 (E.D.Mich.1966). While it is possible to find that Fasano Pie Co. acted in behalf of the debtor, it is also possible that Fasano, acting in its own behalf, simply could not service the defendant's particular orders and referred them to Fasano/Harriss without purporting to act in a representative capacity. There has been no showing of any general course of dealings between the two companies and an agency relationship cannot be presumed simply because one party performs an act for another. *In re Gruber Bottling Works, Inc.,* 16 B.R. 348, 353 (Bankr.E.D.Pa.1982); 3 C.J.S. Agency § 491 at 383, or transacts business for another. *McKay v. Brink,* 275 N.W. 72 (Sup. Ct.S.D.1937). Absent proof of an agency relationship, the Court finds the first scenario controlling.

## II. QUASI CONTRACT AND RESTITUTION

The absence of a binding express contract does not preclude the plaintiff's

---

placed in the name of the defendant. Mr. Phillips testified that the reason for this change of names was due to the storage company's concern with Fasano's financial situation. Placing the product in FMA's name assured the storage company, with which FMA regularly conducts business, of renumeration. (depo. at 20, 21)

**7.** An express agency requires an agreement that such a relation shall exist and there must be a meeting of the minds of the parties.

**8.** An agency by estoppel arises from acts and appearances which lead a third party to believe that an agency has been created and the third party detrimentally relied on this appearance.

recovery.[9] A quasi contract is a contract implied in law which employs the legal fiction that a person who has been unjustly enriched promises to make repayment and is based on the dictates of reason and justice. 17 C.J.S. Contracts § 6. The essential elements of a quasi contract are a benefit conferred on the defendant by the plaintiff and acceptance and retention by the defendant of such benefit under circumstances whereby it would be inequitable for him to retain the benefit. *Atlas Concrete Pipe, Inc., v. Roger J. Au & Son, Inc.* 467 F.Supp. 830 (E.D.Mich.1979). Where neither party is proven to be at fault, the court should strive to return the parties to their pre-dealing status quo.

Clearly, since FMA acquired control of the plaintiff's goods and retained the proceeds upon sale without any remittance to the plaintiff it has been unjustly enriched. Heller argues that it should recover $36,340.04 which represents the invoice price of the pies. Mr. Johnson testified that the invoice prices represent the prices that Heller instructed him to charge. (trans. at 45) Plaintiff has offered no evidence, however, that the invoice prices reflect the true fair market value of the goods at the date of their receipt by FMA. Clearly, as to this issue the plaintiff has the burden of proof.

In his answer to interrogatories Mr. Phillips indicated that FMA sold the pies to Food Products, of which he is sole shareholder. The pies were apparently invoiced by FMA in the amount of $26,088.41 on April 22, 1982 (answ. to interrog. # 3),[10] which Mr. Phillips claims represented their market value in the industry at this date. (answ. to interrog. # 4)[11] However, FMA did not receive remuneration for the pies until they were eventually resold by Food Products (answ. to interrog. # 6(c))[12], the proceeds of such sales totaling only $18,718.16. (answ. to interrog. # 6(c)(i)) Mr. Phillips has also testified that due to Fasano Pie Co. going out of business, Fasano products were selling from forty to fifty cents on the dollar. (depo. at 22)

■ The discrepancy between the FMA invoice prices and the amount it actually received was unexplained by the defendant. Since FMA took custody of the pies and control of their sale, the Court believes that it is properly chargeable with their value at the time of their receipt. FMA apparently made no attempt to locate an independent purchaser who was willing to pay the full value of the pies on April 22, 1982. Accordingly, the plaintiffs are entitled to restitution in the amount of $26,088.41.[13]

**9.** The Court notes that the majority decision in *National Crankshaft Co. v. National Gas Industries, supra* did not consider the unjust enrichment doctrine in holding that the defendant was not contractually liable while the dissenting judge believed restitution should have been ordered.

**10.** Mr. Phillips has listed no sales transacted between FMA and Food Products between 1980–1983 except those reflected by two invoices both dated April 22, 1982, in the combined amount of $26,088.41. While invoice # 1418 in the amount of $17,207.57 is identified as a sale of pies (answ. to interrog. # 4) and has been supplied to the Court, the Court has no direct information on invoice # 1424 in the amount of $8,880.84. However, comparing the debtor's invoices, which are more inclusive, to the defendant's invoice # 1418, it appears that invoice # 1424 must also represent the sale of the debtor's pies.

**11.** Mr. Phillips indicated that invoice # 1418 was based upon the market value in the industry for the pies at the date of the transaction with Food Products. (answ. to interrog. # 4) Presumably,

the same would be true of invoice # 1424. The Court dismisses Heller's contention that the sale between FMA and Food Products was not an arms length transaction or that FMA had no incentive to receive the fair market value of the pies since it would be obligated to turnover any amount in excess of its claimed setoff as mere speculation.

**12.** The dates of resale of the pies by Food Products are as follows: April 26, 1982; April 27, 1982; May 26, 1982; June 3, 1982; and July 8, 1982.

**13.** The court notes that the storage fees incurred over a two month period in the total amount of $2,314.20 were paid by Food Products, not FMA, therefore the defendant cannot offset this expense. Further, there was no evidence that Food Products acted diligently, by industry standards, in disposing of the pies over a two month period.

## III. SETOFF

The defendant has pleaded a right to setoff against its liability to Heller $16,-457.88 representing unpaid commissions for brokerage services supplied to Fasano by FMA.[14] Mr. Phillips testified that FMA did not order the pies at issue with the intention of acquiring a right of setoff. (depo. at 42)

Under 11 U.S.C. § 553(a),[15] a creditor may only offset those debts that are mutually owing between the debtor and creditor. "To be mutual the debts must be in the same right and between the same parties, standing in the same capacity." 4 Collier on Bankruptcy ¶ 553.04 at 553–22 (15th ed. 1980). The mutuality requirement is to be strictly construed. *See In re Virginia Block Co.*, 16 B.R. 560, 562 (Bankr.W.D.Va.1981).

FMA's claim of setoff is premised on the right of the party who contracts with an agent for an undisclosed principal to offset against the undisclosed principal any claim he could have asserted against the agent. Since the Court has found that no agency relationship existed between Fasano and the debtor, *see* discussion Part I

*supra*, the defendant's claim of setoff must be denied on this basis.

Further, the parties have offered no evidence as to any intercorporate relationship between Fasano and Fasano/Harriss. Even assuming that one exists, it is well established that "one subsidiary may not setoff a debt owed to a bankrupt against a debt owing from the bankrupt to another subsidiary." *Depositors Trust Co. v. Frati Enterprises*, 590 F.2d 377, 379 (1st Cir.1979). The same rule applies with a parent corporation and a wholly owned subsidiary. *See Inland Steel Co. v. Berger Steel Co., Inc.* 327 F.2d 401, 403–404 (7th Cir.1964). Since an intercorporate relationship is insufficient to meet the mutuality requirement in an offensive claim of setoff by a member at the corporate family against a third party, it likewise is insufficient to meet the mutuality requirement in a third party claim of setoff against a member of the corporate family. Courts have carved out an exception to this general rule in the "triangular tradeoff" situation. The courts have found mutuality between three parties, as a matter of contract law, where there was an express agreement clearly evidencing the intent of the

14. Although Heller recognizes the filing of an action by FMA to collect this amount prior to the debtor's filing of bankruptcy (amended compl. # 14), it claims that since no testimony was adduced at trial as to the entry of such alleged judgment, nor the amount thereof, this Court does not have before it facts sufficient to consider such setoff claim. (Pl's post-trial brief at 6) It is likely that no such judgment presently exists due to Fasano Pie Co.'s own bankruptcy filing and automatic stay protection. Nevertheless, case law recognizes that where a debt is absolutely owing, even though unmatured or unliquidated, prior to the date of filing of the bankruptcy petition, the right of setoff must be regarded as "manifestly present." *In the Matter of Isis Foods, Inc.*, 24 B.R. 75 (Bankr.W.D.Mo. 1982). *See also In re Lawrence*, 19 B.R. 627 (Bankr.E.D.Ark.1981). To hold to the contrary would permit the use of the automatic stay as a sword, thus destroying an otherwise valid right of setoff, rather than as a shield to preserve the status quo. In short, a party need not come into court with a judgment in hand to assert a right of setoff, thus the Court will proceed to decide this issue.

15. Section 553(a) provides:

Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that...

(1) the claim of such creditor against the debtor is disallowed other than under section 502(b)(3) of this title;

(2) such claim was transferred, by an entity other than the debtor, to such creditor...

(A) after the commencement of the case; or

(B)(i) after 90 days before the date of the filing of the petition; and

(ii) while the debtor was insolvent; or

(3) the debt owed to the debtor by such creditor was incurred by such creditor...

(A) after 90 days before the date of the filing of the petition;

(B) while the debtor was insolvent; and

(C) for the purpose of obtaining a right of setoff against the debtor.

parties to treat the related corporations as a single entity. *In re Balducci Oil Co., Inc.,* 11 B.C.D. 237, 240, 33 B.R. 847 (Bankr. D.Col.1983). Such an arrangement has been described as a "unique situation" in which the parties must establish their agreement "at the outset of their relationship." *In re Virginia Block Co., supra* at 562. Since no intercorporate relationship and agreement to treat the Fasano companies as a single entity has been proved, the defendant's claim of setoff must fail. Obviously, this does not preclude FMA from continuing to prove any such claim against Fasano Pie Co. directly.

Accordingly, the plaintiffs are entitled to recover $26,088.41, each party to bear its own costs and attorneys fees.