**In re Paul H. JONES, Jr. and Debra E. Jones**

**Paul H. Jones, d/b/a Paul Jones Company; Paul H. Jones, d/b/a Owens Pecan and Cattle Company; Paul H. Jones, d/b/a Pushmataha Enterprises; and Joanne H. Jones**

**Pushmataha Plantation, Inc.**

**Paul H. JONES, Jr., et al., Plaintiffs,**

v.

**UNITED STATES of America, Acting for and on Behalf of COMMODITY CREDIT CORPORATION, Defendant.**

**Bankruptcy Nos. E85–20198, E85–20199 and E85–20203.**
**Adv. No. 87–0209.**

United States Bankruptcy Court, N.D. Mississippi.

Oct. 13, 1989.

States Department of Agriculture, hereinafter referred to as CCC, to recover certain pecan disaster payments allegedly due Jones, Sr., from CCC; answer and counterclaim having been filed by CCC to set off an alleged mutual debt owed to CCC by a separate debtor, Pushmataha Plantation, Inc., hereinafter referred to as Pushmataha Plantation, a corporation whose stock is wholly owned by Jones, Sr., said debt arising under the provisions of the price support loan program; all issues having been joined between the parties and the matter having proceeded to trial with proof being introduced by oral testimony, stipulations and documentary exhibits; and the Court having heard and considered same, hereby finds as follows, to-wit:

## I.

The Court has jurisdiction of the subject matter of and the parties to this adversary proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (B), (E), and (O).

## II.

There are essentially three issues in this adversary proceeding which will be addressed by the Court in the following order:

A. CCC deficiency claim against Pushmataha Plantation, Inc., resulting from the price support loan program.

B. Commercial reasonableness of the sale of the Pushmataha Plantation, Inc., soybeans to Archer Daniels Midland Co.

C. CCC claim against Paul Jones, Sr., d/b/a Owens Pecan and Cattle Company, for the setoff of certain pecan disaster payments against the aforementioned deficiency allegedly owed to CCC by Pushmataha Plantation, Inc.

## III.

A. CCC DEFICIENCY CLAIM AGAINST PUSHMATAHA PLANTATION, INC., RESULTING FROM THE PRICE SUPPORT LOAN PROGRAM.

### 1.

Three farm storage notes and security agreements were executed in connection

Craig M. Geno, Jackson, Miss., for Paul H. Jones, et al.

Patricia D. Rogers, Asst. U.S. Atty., Oxford, Miss., for U.S.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the Court is the complaint filed by the debtor, Paul H. Jones, Sr., d/b/a Owens Pecan and Cattle Company, hereinafter Jones, Sr., against the United States of America, acting for and on behalf of the Commodity Credit Corporation, an agency within the United

with three price support loans made to Pushmataha Plantation, Inc., tax identification number 64–0541201, as follows:

| LOAN NOS. | DATE | AMOUNT | COLLATERAL | BUSHELS | EXHIBIT NO. |
|---|---|---|---|---|---|
| 8 or 42 | 1/29/86 | $291,414.20 | 1985 soybeans | 57,365 | Exhibit 5 |
|  |  | 38,836.60 | 1985 soybeans | 7,645 | Exhibit 5 |
|  |  | 17,515.84 | 1985 soybeans | 3,448 | Exhibit 5 |
|  |  | $347,766.64 |  | 68,458 |  |
| 9 or 43 | 1/29/86 | $ 13,014.96 | 1985 soybeans | 2,562 | Exhibit 4 |
| 10 or 44 | 1/29/86 | $ 8,519.16 | 1985 soybeans | 1,677 | Exhibit 6 |
|  | Totals | $369,300.76 |  | 72,697 |  |

After the loans went into default, the soybeans were removed from the seven grain bins located at Pushmataha Plantation by CCC between May 8, 1987 and May 20, 1987. They were transported to Archer Daniels Midland Co., hereinafter ADM, where they were ultimately purchased by ADM some six weeks later. The receipts allocated to Pushmataha Plantation are reflected as follows:

| LOAN NOS. | DOLLAR AMOUNT | BUSHELS | SALES PRICE/ BUSHEL (Exhibit 14) |
|---|---|---|---|
| 8 or 42 | $276,469.46 | 59,074.67 | $4.81 |
| 9 or 43 | $ 9,578.42 | 2,046.67 | $4.81 |
| 10 or 44 | $ 1,743.14* | 357.20* |  |
|  | 8,547.17 | 1,751.47 |  |
|  | $ 10,290.31 | 2,108.67 | $5.01 |
|  | Totals $296,338.19 | 63,230.01 |  |

* Shown as received on Exhibit 5 but actually a part of the collateral pledged on Exhibit 6.

CCC calculated the dollar deficiency owed by Pushmataha Plantation after the sale to ADM as follows:

| LOAN NOS. | SURPLUS/ DEFICIENCY (Exhibits 15 and 16) | |
|---|---|---|
| 8 or 42 | 79,104.54 | deficiency |
| 9 or 43 | $ 3,813.58 | deficiency |
| 10 or 44 | ( 1,742.81) | surplus |
|  | $81,175.31 | net deficiency |

The net deficiency for Pushmataha Plantation was raised to $82,348.47 as reflected on Exhibit 17.

The bushel deficiency for Pushmataha Plantation is calculated as follows:

| LOAN NOS. | COLLATERAL PLEDGED | DELIVERED | SURPLUS/ DEFICIENCY | |
|---|---|---|---|---|
| 8 or 42 | 68,458 | 59,074.67 | 9,383.33 | deficiency |
| 9 or 43 | 2,562 | 2,046.67 | 515.33 | deficiency |
| 10 or 44 | 1,677 | 2,108.67 | (431.67) | surplus |
| | 72,697 | 63,230.01 | 9,466.99 | net deficiency |

The quantities of soybeans removed from the same grain bins, but allocated to the loan accounts of Paul Jones, Jr., are reflected as follows:

| BUSHELS | SALE PRICE/ BUSHELS (Exhibit 14) |
|---|---|
| 13,370.00 | $5.33 |
| 5,308.33 | 4.92 |
| 18,678.33 | |

81,908.34 total bushels were, therefore, removed by CCC and delivered to ADM for sale.

Although no loan documentation was introduced into evidence, reflecting the amounts borrowed or collateral pledged by Paul Jones, Jr., no deficiency whatsoever has been assessed by CCC against him.

2.

The CCC price support loans to Pushmataha Plantation were made through the Coahoma County, Mississippi, Agricultural Stabilization and Conservation Service office, whose county executive director was Oby W. Easley, III, hereinafter Easley. Prior to the loans being consummated, Easley made meticulous measurements of the quantities of soybeans which were stored in the seven grain bins located at Pushmataha Plantation. The amount of the loans depended primarily on the quantity and test weights of the soybeans which served as collateral for the loans.

During the time that the loans were outstanding, CCC, through Easley or another employee, Tim Morris, made several inspections of the soybeans. The dates of these inspections are reflected on the farm storage loan work sheets which were appended to Joint Exhibits 4, 5, and 6. On all occasions, these inspections resulted in satisfactory reports.

On April 28, 1987, after obtaining relief from the automatic stay, Connecticut General Life Insurance Company foreclosed on the real property owned by Pushmataha Plantation which included the land on which the grain bins were situated. The soybeans were inspected by Easley on this date, and again by Tim Morris on April 30, 1987. Because Pushmataha Plantation lost control of its farm storage facilities, CCC demanded payment of the price support loans or, alternatively, for delivery of the soybeans. *See,* Joint Exhibit 8. On May 8, 1987, after CCC had been advised by Pushmataha Plantation that it had no funds with which to remove and deliver the soybeans, CCC began removing the soybeans under the direction of Morris. CCC employed the services of Buddy Carlson, a local farmer who also operates a trucking business, to transport the soybeans to ADM for storage and ultimately for sale. During this time, Jones, Sr., on behalf of Pushmataha Plantation, requested CCC on several occasions to inspect the soybeans so that there would be no unexplained losses.

■ The testimony of Easley, Morris, Jones, Sr., and Paul Jones, Jr., was remarkably consistent to the effect that the quantity of soybeans had not diminished from the time that the price support loans were

made until the removal process was initiated by CCC. There was also no indication that prior to removal that there was anything wrong with the quality of the soybeans.

As can be observed from Joint Exhibit 14, 81,908.34 bushels of soybeans, belonging to both Pushmataha Plantation and Paul Jones, Jr., were eventually sold to ADM. These soybeans were transported to ADM in 83 loads, which indicates that almost 1,000 bushels per load were trucked. The testimony was consistent that ordinarily one load should contain between 800 to 900 bushels or an average of no more than 850 bushels per load. Obviously these trucks were overloaded by at least 100 to 200 bushels per truck. Morris candidly indicated that he had been told by Easley that CCC could not spend a lot of money to remove and haul these soybeans "just right." Jones, Sr., and Paul Jones, Jr., testified that during the removal process the trucks were overloaded, that beans were spilled on the ground, that some were shoveled up and put back on the trucks and that others were just run over. Considering the size of the loads being hauled to ADM, the Court finds the testimony of the Joneses to be credible.

The Court is of the opinion that since there were no apparent shortages in the quantity of the soybeans prior to their being removed from the bins, the ultimate shortages resulted not from any fault of Pushmataha Plantation or Paul Jones, Jr., but rather from the CCC removal and trucking procedures. To assess damages against Pushmataha Plantation for any shortages in quantity, under the factual circumstances as presented to the Court, would be manifestly inequitable.

### 3.

■ Easley indicated that the dollar deficiency assessed against Pushmataha Plantation was caused by both a shortage in quantity and a substandard quality of the soybeans. He could not assign a definitive amount of damages, however, attributable to either cause. Since the Court is of the opinion that the shortages in quantity were caused directly by CCC and not by Push-

mataha Plantation, in order to calculate a deficiency, if any, caused by the substandard quality of the soybeans, some evidence supporting this claim for damages must be offered by CCC. In this proceeding, CCC has chosen to assess its deficiency claim based solely on the difference between the outstanding loan balances plus the cost of removal, transportation, etc., precise figures of which were not presented to the Court, and the price eventually paid by ADM to CCC for the soybeans. Since a part of this total deficiency necessarily includes damages resulting from the shortages in quantity, the Court cannot even speculate as to the extent of the damages that might have resulted from the inadequate quality of the soybeans.

Insofar as quality is concerned, the Court makes the following observations, to-wit:

a. Both Paul Jones, Sr., and Paul Jones, Jr., admitted that there were some damages to approximately 1,000 bushels of soybeans caused by heat, but that these damages were nominal. The ADM test reports contained numerous references to heat damaged beans, musty beans, or sour beans. The Court is of the opinion that if the soybeans were damaged this extensively that some comment to this effect should have appeared on the CCC inspection reports. To the contrary, the exhibits indicate that the inspections were all satisfactory.

b. CCC chose not to make any independent tests of the quality of the Pushmataha Plantation soybeans, but elected to rely on the tests performed by ADM, the ultimate purchaser. As James Williams, the manager of ADM's quality control lab, indicated, ADM usually purchases soybeans that are delivered to its warehouse.

c. Williams, who has 31 years experience in analyzing the quality of soybeans, would ordinarily be considered an expert in this field. He was not offered as an expert witness, however, and did not quantify the extent of damages in "dollars and cents" resulting from the alleged substandard quality. He indicated that moisture and foreign materials were not significant adverse factors, but stated that the quality of

the soybeans was largely diminished as a result of heat damage and discoloration. The test results that were introduced into evidence were performed under Williams supervision when the soybeans were initially delivered to ADM. Williams testified that these test results were consistent with earlier "on site" tests that he had conducted prior to the soybeans being removed from the grain bins. However, no written reports of these earlier tests were available at trial.

d. After the soybeans were tested at ADM, they were piled up and stored in an open building for several weeks.

e. The methodology used to calculate the price paid by ADM to CCC for the sale of the soybeans is somewhat of a mystery. Joint Exhibit 14, a memorandum from the Coahoma County ASCS Office to the Mississippi State ASC Committee, dated June 26, 1987, requested the acceptance of bids from Southern Cotton Oil Co. of Clarksdale, Mississippi, in the following amounts:

| PRODUCER | LOAN NO. | BUSHELS | RATE |
|----------|----------|---------|------|
| Paul Jones | 40 | 13,370.00 | 5.33 |
| Paul Jones | 41 | 5,308.33 | 4.92 |
| Pushmataha | 42 | 59,074.67 | 4.81 |
| Pushmataha | 43 | 2,046.67 | 4.81 |
| Pushmataha | 44 | 2,108.67 | 5.01 |

The prices offered per bushel are questionable for a variety of reasons. Essentially, there was no way to differentiate between the soybeans owned by Pushmataha Plantation from those owned by Paul Jones, Jr. Although Pushmataha Plantation and Paul Jones, Jr., maintained an accountability for the quantities of soybeans that they each owned, the beans had been commingled for sometime as they were dried within the several bins. In addition, when Morris removed the soybeans from the grain bins, he used the original loan documentation, which was outdated as to the ownership locations, and which had the effect of inaccurately allocating the ownership of the beans between Pushmataha Plantation and Paul Jones, Jr. This inability to differentiate between entities is extremely significant when attempting to assess a deficiency resulting from a purported substandard quality of the pledged collateral.

f. CCC offered no testimony as to whether the sales prices were set at the time the soybeans were delivered to ADM or whether these prices were set after the beans had been stored in the open building at ADM for several weeks. There is little doubt that the quality of the soybeans would begin to diminish if left in an open building for an extended period of time. Certainly this would effect the price that ADM would be willing to pay.

g. No one could testify why Paul Jones, Jr., received a significantly better price for his soybeans than did Pushmataha Plantation. Since no one knew exactly whose soybeans belonged to whom, it is remarkable to see the prices allocated as set forth hereinabove.

The individual tickets, representing the tests conducted by ADM, did differentiate, albeit erroneously, between Pushmataha Plantation's soybeans and Paul Jones, Jr.'s, soybeans. The Court presumes that this was the methodology used to establish the allocated prices although there was no testimony to this effect.

In reality, since an inaccurate identification had occurred as the soybeans were being removed from the grain bins, notwithstanding the fact that the soybeans were totally commingled while being stored at ADM, it is unreasonable to presume that the allocations made by CCC on Joint Exhibit 14 are even remotely accurate. Yet CCC has now asserted a deficiency claim against Pushmataha Plantation based on this obviously flawed calculation. No defi-

ciency has been assessed against Paul Jones, Jr., but, of course, he does not have any assets against which this deficiency could be setoff. In short, the Pushmataha Plantation deficiency was concocted on the basis of figures which are not supported by the underlying facts.

The Court recognizes that pursuant to paragraph (j) of the farm storage notes and security agreements, that the producer is liable for all losses due to quantity or quality of the commodity. However, when the quantity loss is actually the fault of CCC and not the producer, and when the quality loss is not proven with some degree of certainty, no damages can be assessed against the producer. Under the circumstances of this case, to assess qualitative damages against Pushmataha Plantation in some speculative amount, based on the proof offered by CCC, would be manifestly inequitable.

## IV.

**THE COMMERCIAL REASONABLENESS OF THE SALE OF THE PUSHMATAHA PLANTATION SOYBEANS TO ARCHER DANIELS MIDLAND CO.**

The Court has indicated hereinabove that it cannot assess a deficiency against Pushmataha Plantation for essentially two reasons:

1. That part of the deficiency which was attributed to a shortage in quantity of the soybeans was not caused by the producer, Pushmataha Plantation, but rather was caused by the ineptitude of CCC in the removal, transportation, and storage of the soybeans; and

2. That part of the deficiency attributed to the inadequate quality of the soybeans was not proved by CCC to any degree of certainty, but rather the proof displayed extraordinary inaccuracies in the allocation of the sales prices between Pushmataha Plantation and Paul Jones, Jr.

In support of the aforementioned conclusion, the Court will next examine the commercial reasonableness of the sale of the soybeans by CCC to ADM.

The evidence presented has revealed that the soybeans which secured the Pushmataha Plantation price support loans were removed from the grain bins, where they had been located since January 29, 1986, in what could best be described as a haphazard manner. The soybeans were transported to ADM where they were sampled and tested, then piled up in an open building along with soybeans owned individually by Paul Jones, Jr.

According to Joint Exhibit 14, there was an advertisement for the local sale of these soybeans, but neither the form of this advertisement nor its circulation were discussed. As mentioned earlier, only one bid was received and that from Southern Cotton Oil Co. of Clarksdale, Mississippi. The soybeans were obviously sold to ADM. Whether the bidder, Southern Cotton Oil Co. of Clarksdale, Mississippi, was affiliated with ADM, the purchaser, is still another unanswered question.

Since bids were solicited, the Court must presume that the price per bushel reflected on Joint Exhibit 14 was determined sometime after the soybeans had been left for storage at ADM. There is, however, little information in the record to support this conclusion.

The Court has observed the following language appearing in the farm storage notes and security agreements, to-wit:

Foreclosure. (a) Removal and Sale. If prior to maturity of the note, CCC determines that the commodity can no longer be stored because of danger of deterioration or other reasons, or if, upon maturity of the note, the loan indebtedness (i.e., the unpaid amount of the loan, charges, and interest) is not satisfied by payment of the amount thereof or by the delivery of an eligible commodity pursuant to the provisions of the note, the producer authorizes CCC, or its agent, to the extent permitted by law, to enter on the premises and remove the collateral commodity; to commingle such commodity with any other commodity of the same kind; and to sell, assign, transfer, and deliver such commodity, or documents evidencing title thereto, at such time, in such manner, for

cash or upon terms and conditions as the holder(s) may determine, at any commodity exchange or elsewhere, or through any agency, at private or public sale, for immediate or future delivery, and without demand, advertisement, or notice of the time and place of sale, or adjournment thereof, or otherwise. Any such disposition may be similarly effected without removing the commodity from storage and the commodity may be processed before such disposition. Upon such sale CCC may become the purchaser of the whole or any part of the commodity.

The soybeans were removed and sold in keeping with the literal provisions of the farm storage notes and security agreements. However, the totality of the circumstances surrounding the performance by CCC bears careful scrutiny. Section 75-9-501(3), Miss.Code Ann., hereinafter MCA, provides as follows:

(3) To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsections referred to below may not be waived or varied except as provided with respect to compulsory disposition of collateral (section 75-9-504(3) and section 75-9-505(1)) and with respect to redemption of collateral (section 75-9-506); but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable:

(a) section 75-9-502(2) and section 75-9-504(2) insofar as they require accounting for surplus proceeds of collateral;

(b) section 75-9-504(3) and section 75-9-505(1) which deal with disposition of collateral;

(c) section 75-9-505(2) which deals with acceptance of collateral as discharge of obligation;

(d) section 75-9-506 which deals with redemption of collateral; and

(e) section 75-9-507(1) which deals with the secured party's liability for failure to comply with this Part.

Section 75-9-504(3), MCA, provides as follows:.

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one (1) or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms, but every aspect of the disposition including the method, manner, time, place and terms must be *commercially reasonable.* Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, *reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor,* if he has not signed *after default* a statement renouncing or modifying his right to notification of sale. In the case of consumer goods, no other notification need be sent. In other cases, notification shall be sent to any other secured party from whom the secured party has received (before sending his notification to the debtor or before the debtor's renunciation of his rights) written notice of a claim of an interest in the collateral. The secured party may buy at any public sale; and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale. (emphasis added)

At the trial, Easley testified that Pushmataha Plantation was aware of the sale of the soybeans to ADM. There was no written documentation, however, introduced into evidence concerning this notification, and the timing of the notification was not recalled. Paul Jones, Sr., stated that he received no notice concerning the sale of the soybeans to ADM until he received a letter from Easley, dated June 29, 1987, assessing the dollar deficiency following the sale.

The Mississippi Supreme Court in *McKee v. Mississippi Bank and Trust Co.*, 366 So.2d 234, 238 (Miss.1979) construed

§ 75–9–504(3), MCA, as requiring written notice, rather than merely verbal notice of the proposed sale or disposition of repossessed collateral. It also held that in the absence of compliance with the statutory notice requirement that the burden was upon the creditor, here CCC, to prove that a fair market value was received for the collateral, as well as, to prove that it pursued reasonable commercial practices in disposing of the collateral. *Id.* at pg. 237. *See also, Savings Bank of New Britain v. Booze,* 34 Conn.Supp. 632, 382 A.2d 226, 23 U.C.C. Reporting Service 556 (Conn.Sup. Ct., App.Ses.1977).

In the case before this Court, there is a total lack of evidence that any written notice was ever sent by CCC to Pushmataha Plantation regarding the sale of the soybeans to ADM. CCC has attempted to convince the Court that the price received for the soybeans was a fair market price, as well as, that it acted in a commercially reasonable manner in disposing of the soybeans. For the reasons specified earlier in this opinion, the Court cannot determine how the price was calculated for the soybeans, when the price was established, or that the price represented a fair market value. The Court certainly does not think that the soybeans were disposed of in a commercially reasonable manner considering the procedures utilized to remove the soybeans from the grain bins and the fact that the soybeans were allowed to be piled up in an open building for almost six weeks prior to their actual sale.

In the alternative, CCC contends that it complied with the written language set forth in the farm storage notes and security agreements, implying that this language constitutes a waiver of the requirements specified in § 75–9–504(3), MCA. Presumably, CCC's contention is based on the statutory language set forth in § 75–9–501(3), MCA, which states, inter alia, that the parties may by agreement, determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable. This Court is of the opinion that the language appearing in the farm storage notes and security agreements cannot operate as a waiver of the totality of circumstances that exist in this case. This Court reiterates that the procedures, utilized by CCC to liquidate the Pushmataha Plantation soybeans, were so totally devoid of any hint of commercial reasonableness that a waiver of such conduct would be manifestly inequitable.

For this additional reason, this Court refuses to allow CCC to assess a deficiency claim against Pushmataha Plantation.

### V.

### CCC CLAIM AGAINST PAUL JONES, SR., d/b/a OWENS PECAN AND CATTLE CO. FOR SET OFF OF CERTAIN PECAN DISASTER PAYMENTS OWING FROM CCC TO PAUL JONES, SR., d/b/a OWENS PECAN AND CATTLE CO.

On January 29, 1987, Owens Pecan and Cattle Co. by Paul H. Jones, Sr., filed an application to receive disaster payments which were applicable to the 1986 pecan crop. *See,* Joint Exhibits 18 and 19. As a result of this application, CCC approved the disaster payments for Owens Pecan and Cattle Co. as evidenced by the following commodity certificates:

| ISSUE DATE | AMOUNT |
|---|---|
| 8/15/87 | $ 8,017.65 |
| 8/15/87 | 10,000.00 |
| 2/26/87 | 52,011.88 |
| | $70,029.53 |

CCC has taken the position that since a deficiency resulted from the price support loans granted to Pushmataha Plantation, which is owned 100% by Paul Jones, Sr., that the pecan disaster payments owed to Owens Pecan and Cattle Co. should be setoff against the deficiency. Owens Pecan and Cattle Co. is a proprietorship trade name utilized by Paul Jones, Sr. Since the Court has refused to assess a deficiency against Pushmataha Plantation, a discussion of this issue is actually not necessary. However, in an effort to promote judicial economy, the Court will address this issue in the alternative.

CCC has chosen to rely on § 553(a) of the Bankruptcy Code which provides as follows:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title [11 USCS §§ 362 and 363], this title [11 USCS §§ 101 et seq.] does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title [11 USCS §§ 101 et seq.] against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtor is disallowed other than under section 502(b)(3) of this title [11 USCS § 502(b)(3)]; ·

(2) such claim was transferred, by an entity other than the debtor, to such creditor—

(A) after the commencement of the case; or

(B)(i) after 90 days before the date of the filing of the petition; and

(ii) while the debtor was insolvent; or

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition;

(B) while the debtor was insolvent; and

(C) for the purpose of obtaining a right of setoff against the debtor.

This section obviously provides for the setoff of mutual debts incurred pre-petition. In the instant case, the price support loans deficiency assessed by CCC against Pushmataha Plantation arose post-petition, as did the obligation to pay the pecan disaster payments by CCC to Owens Pecan and Cattle Co. Although mutual post-petition obligations could likely be setoff under governing state law, the setoff of post-petition obligations under the Bankruptcy Code has been addressed in *In re Mohawk Industries, Inc.*, 82 B.R. 174, 178–89 (Bankr. D.Mass.1987), as follows:

"... Section 553 does not attempt to deal with the setoff of post filing debts; it refers only to mutual debts which arose prior to the commencement of the case. Setoff of mutual post filing debts, however, is generally allowed despite the lack of any express statutory authorization. *In re Alfar Dairy, Inc.*, 458 F.2d 1258 (5th Cir.1972), cert. den. 409 U.S. 1048, 93 S.Ct. 517, 34 L.Ed.2d 501 (1972); *Matter of Fordson Engineering Corp.*, 25 B.R. 506 (Bankr.E.D.Mich.1982). We agree that a post filing debt may be setoff provided that it has mutuality with the other debt."

If indeed the deficiency resulting from the price support loans was legitimate, CCC would be further confronted in this proceeding with the requirement that the obligations be mutual. Clearly, the deficiency obligation would be owed by Pushmataha Plantation, Inc., a corporation whose stock is owned exclusively by Paul Jones, Sr. On the other hand, the pecan disaster payments are owed by CCC to Paul Jones, Sr., d/b/a Owens Pecan and Cattle Co., an individual proprietorship. There are numerous cases which recognize that a corporation and its principal stockholder are not mutual entities to which setoff can apply. *See, In re Plymouth Plaza Office Bldg. Associates*, 16 B.R. 113 (Bankr.E.D.Penn.1981) (The court held where the lessee owed rent to the debtor who, in turn, owed the president of the lessee on a promissory note, there was no mutuality.); *In re Condor Diamond Corp.*, 76 B.R. 342 (Bankr.S.D.N.Y.1987) (The court held that the required mutuality was lacking because the corporate principal was a distinct and separate person from the debtor corporation.); *In re Ingersoll*, 90 B.R. 168 (Bankr.W.D.N.C.1987) (The fact that a corporation's principal was the guarantor of the corporation's debt to debtors did not satisfy the mutuality requirement for setoff of the corporation's debt owed to the debtors against the debtors' debt owed to the principal.); *In re Eighteenth Avenue Development Corp.*, 12 B.R. 10 (Bankr.S.D.Fla.1981) (In regard to setoff under the Bankruptcy Code, the debts must be in the same right and be-

tween the same parties who stand in the same capacity.); *Matter of Fasano/Harriss Pie Co.,* 43 B.R. 864 (Bankr.W.D.Mich. 1984) (One subsidiary may not setoff a debt owed to a bankrupt against a debt owing from the bankrupt to another subsidiary. The rule has identical application when the parties are a parent corporation and a wholly owned subsidiary.); *In re Todd,* 37 B.R. 836 (Bankr.W.D.La.1984) (For purposes of determining a creditor's right to setoff, "mutuality of obligation" means that the obligations must be between the same parties. To allow setoff the Court must find that the claims of the parties are owing to and due in the same rights and capacities.)

■ Under the Bankruptcy Code, concerning the right of setoff, the requirement of mutuality of debts is to be strictly construed. *See, In re Balducci Oil Co., Inc.,* 33 B.R. 847 (Bankr.D.Colo.1983); *In re Bacigalupi, Inc.,* 60 B.R. 442 (9th Cir. BAP 1986); *In re Harbaugh,* 99 B.R. 671 (Bankr.W.D.Penn.1989); *In re WJM, Inc.,* 65 B.R. 531 (Bankr.D.Mass.1986).

■ CCC has asserted that Pushmataha Plantation, Inc., is merely the "alter ego" of Paul Jones, Sr., and, as such, CCC contends that the requirement of mutuality exists. CCC has cited *United States v. Jon–T Chemicals, Inc.,* 768 F.2d 686, 691 (5th Cir.1985), which offers the following insight:

"In lieu of articulating a coherent doctrinal basis for the alter ego theory, we have instead developed a laundry list of factors to be used in determining whether a subsidiary is the alter ego of its parent. These include whether:

1. the parent and the subsidiary have common stock ownership;

2. the parent and the subsidiary have common directors or officers;

3. the parent and the subsidiary have common business departments;

4. the parent and the subsidiary file consolidated financial statements and tax returns;

5. the parent finances the subsidiary;

6. the parent caused the incorporation of the subsidiary;

7. the subsidiary operates with grossly inadequate capital;

8. the parent pays the salaries and other expenses of the subsidiary;

9. the subsidiary receives no business except that given to it by the parent;

10. the parent uses the subsidiary's property as its own;

11. the daily operations of the two corporations are not kept separate; and

12. the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.

The proof in this case has shown the Court the following:

1. Pushmataha Plantation was not engaged in any phase of pecan farming.

2. Owens Pecan and Cattle Co. did not operate on the same land utilized by Pushmataha Plantation.

3. All records were separated and the entities utilized separate fiscal years for tax purposes.

4. There was no showing whatsoever of any fraudulent conduct on the part of any entity.

5. There was no showing that any of the debtor entities commenced operations with an unreasonably small capital infusion.

6. There was an observation of corporate formalities by Pushmataha Plantation.

7. The Pushmataha Plantation price support loans were not individually guaranteed by Paul Jones, Sr., and/or Owens Pecan and Cattle Company.

This bankruptcy adversary proceeding could best be described as a breach of contract cause of action from each side. As mentioned immediately hereinabove, there has been no proof whatsoever of any fraud being perpetrated by any of the debtor entities. *United States v. Jon–T Chemicals, Inc., supra,* indicated that in contract cases, fraud is an essential element to support an "alter ego" finding. *See also, Edwards Co. v. Monogram Industries,* 730 F.2d 977 (5th Cir.1984). This Court is,

therefore, of the opinion that the "alter ego" theory posited by CCC is not well taken. As such, there is no mutuality existing in the deficiency assessed by CCC against Pushmataha Plantation and the pecan disaster payment obligation owed by CCC to Owens Pecan and Cattle Company. CCC's request for setoff is impermissible in this bankruptcy proceeding.

CCC is, therefore, liable to Paul Jones, Sr., d/b/a Owens Pecan and Cattle Company in the sum of $70,029.53, with interest accruing thereon at the highest rate permitted by law from and after the date of the judgment which will be entered contemporaneously herewith.

So Ordered.